# EXHIBIT 1



EEO Complaint : Discrimination in HUD

| 1. Name Russell J. Archibald | 2. SSN | Case No. (For HUD Use Only) BN-DC-CI |
| 3. Mailing Address 4 Norwich Dr. Johnston, R.I. 02919 | 4. Home Phone 401-949-4119 | 6. Are You Now Working for the Federal Government? ☒ Yes ☐ No |
|  | 5. Work Phone 617-565-5312 |  |
| 6. Position Title E.O. Specialist | 7. Grade & Series 12 |  |

| 9. Office Where You Believe Discrimination Occurred (Include Division, Office, City, State, and ZIP) FHEO Enforcement Boston, MA 02222 | 10. Name, Title and Organizational Unit of Person(s) Who Took the Action(s) You Allege Was Discriminatory (e.g., Mary Smith, Asst Dir, Ofc of Housing) Eva Plaza, Asst. Secretary Marcella Brown, HUB Director |

| 11. Name and Address of Agency Where You Work. Office FHEO Oneill Fed. Bldg Boston, MA 02222 | 12. Date Notice of Right to File Complaint Received 1/6/2000 |

| 13. I designate this person to be my representative. a. Name & Title | b. Address | c. Home Phone |
|  |  | d. Work Phone |

| 14. Type of Discrimination Alleged ☒ Race (Specify): African American ☐ Color (Specify): ☐ Religion (Specify): ☐ National Origin (Specify): ☐ Sex (Specify): ☐ Age (Specify): ☐ Handicap (Specify): ☐ Reprisal (Specify): | 15. Date each Alleged Act of Discrimination Took Place 11/15/99 |

16. Explain the specific actions or situation that resulted in your allegation(s) that you were treated differently than other employees or applicants because of race, color, religion, national origin, sex, age, handicap, or reprisal. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each. Additional pages may be used to explain the alleged act of discrimination.

See Attachment

Exhibit 1

Page 1 of 2

17. I have discussed the issues in Section 16 with an EEO counselor.
☐ Yes Date of initial contact: 11/22/99
Date of final interview: 1/6/2000

18. Name of EEO Counselor
Donald Johnson

19. Corrective Action Sought
Appointment to Grade 13/14. Step increase above my present salary, and money damages

RECEIVED JAN 18 00
UEE0000066

| 20. Signature of Complainant Russell J. Archibald | 21. Date of Complaint 1/11/2000 |

ON AUGUST 9,1999 I SUBMITTED AN APPLICATION AND NECESSARY BACKGROUND DOCUMENTS FOR THE PUBLIC TRUST SPECIALIST POSITION (GS-1101-13) OPENING IN THE BOSTON FHEO OFFICE. (ANNOUNCEMENT NUMBER 00-PTO-1999-0101AZ) ON NOVEMBER 22,1999 I RECEIVED A LETTER DATED NOVEMBER 15,1999 INFORMING ME THE SELECTING OFFICIALS HAD SELECTED LINDA TUTTLE FOR THE POSITION. LINDA TUTTLE IS A WHITE STAFF PERSON IN MY OFFICE WHO FOR THE PAST THREE TO FOUR YEARS HAS WORKED IN THE INTAKE BRANCH OF THE FHEO OFFICE.

I AM AN AFRICAN AMERICAN MALE WITH TWELVE(12) YEARS WORK EXPERIENCE IN THE ENFORCEMENT BRANCH OF FHEO WHO HAS MORE EDUCATION, EXPERIENCE, AND YEARS OF SERVICE THAN THE PERSON WHO WAS SELECTED.

I ALLEGE DISCRIMINATION IN THE SELECTION PROCESS FOR THIS POSITION OPENING. I AM A MEMBER OF A PROTECTED CLASS, AFRICAN AMERICAN, I WAS QUALIFIED FOR THE PROMOTION;I WAS NOT SELECTED EVEN THOUGH I WAS MORE QUAILIED THAN THE PERSON WHO WAS SELECTED; AND THE PERSON SELECTED IS NOT A MEMBER OF A PROTECTED CLASS. I FURTHER ALLEGE OVER THE PAST FIVE TO SIX YEARS THERE HAS BEEN A PATTERN AND PRACTICE OF DISCRIMINATING AGAINST MINORITY EMPLOYEES FOR PROMOTIONS IN FAVOR OF WHITE EMPLOYEES WITH LESS EDUCATION AND WORK EXPERIENCE IN THE BOSTON OFFICE OF FHEO.

THIS COMPLAINT IS BEING FILED AGAINST THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SECRETARY ANDREW CUOMO, ASST. SECRETARY EVA PLAZA, AND BOSTON HUB DIRECTOR MARCELLA BROWN.

Exhibit 1
Page 2 of 2

# EXHIBIT 2

AFFIDAVIT

COUNTY OF SUFFOLK

STATE OF MASSACHUSETTS

I, Russell J. Archibald. African-American, Civil Rights Analyst/Investigator, GS-312-12, Enforcement Branch, Federal Housing and Equal Opportunity Office (FHEO), US Department of Housing and Urban Development (HUD), Boston, Massachusetts give this statement freely and voluntarily to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a discrimination complaint filed by me, knowing that this statement may be used as evidence. I understand that this statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby swear that the information I shall give in this investigation is the truth, the whole truth, and nothing but the truth, so help me God.

I have been in my present position for about twelve years. My immediate supervisor is Anziah Craig, African-American and my next level supervisor is Marcella Brown, also African-American

In August of 1999 I submitted an application for the position of Public Trust Officer, GS-13. The Secretary of HUD, Andrew Coumo, created the position, which was a new position, about six months earlier. There were three vacancies and I applied for the Boston vacancy.

The person selected would work in one of three divisions in FHEO: Intake, Programs or Investigation, and the person selected would remain in his or her Branch,

Page 1 of 7 pages                                        Initials

Exhibit

Page 1 of 8

performing the exact same work of the position they occupied.

The Intake Division was responsible for receiving phone calls from the general public wishing to file a complaint on housing. Once a call comes in the staff in the Intake Division would "perfect the complaint", for example on jurisdictional issues, and determine if it met the guidelines for acceptance. Once the complaint accepted it is submitted to the Chief of the Intake Division who would then make the final decision of making it a "clean" or an actual formal complaint. At that point the complaint sent to the Investigation Division and the case would be assigned to one of five investigators. The Program Operations Divisions oversee state agencies. Within each HUD region, HUD gives money to state agencies such as the Rhode Island Human Rights Commission, Maine Human Rights Commission, New Haven Fair Housing Agency, etc., and the Program Division oversees their activities. As an example, we might accept a housing discrimination complaint and then submit to a state agency for investigation. Our Office pays the state agency for each complaint they investigate. The Program Operations Division monitors them and when they submitted their investigative reports, Program Operations reviews their reports and authorizes payments.

Once a complaint has been perfected, the Investigation Division becomes involved in conciliation, investigation, etc, and if there is a "reasonable cause" finding, prepares the case for trial. I am one of the five investigators in this Division and if I had been successful in getting the position of Public Trust Specialist, I would have remained in my position. I would have continued to do exactly the same work of my present

Initials

Exhibit 6
Page 2 of 8

position as an investigator.

A number of years ago Secretary Coumo brought many new individuals in from the outside as GS-13s, causing animosity among the regular, existing staff. There was a lot of friction between these new individuals and the regular staff to the point individuals were not speaking with one another. This happened in all of the Department of Housing and Urban Development, not just in Fair Housing and Equal Employment, and happened throughout the country. While the existing staff could have competed for these positions, we were told they were only two-year positions, although in the back of the minds of many of us we thought they might be kept on the rolls. It is my judgment that the Public Trust Specialists positions were created by Secretary Coumo to offset the animosity cause by appointment of this new staff.

I believe the application and KSA package I submitted in applying for the Public Trust Specialist position showed me to be a best-qualified applicant. The vacancy announcement had four quality ranking factors: skills in fact-finding and analysis; ability to gather and summarize facts; ability to communicate clearly; and skill in using computers and data base systems. My KSA package addressed each of the quality ranking factors. With regard to skills in fact finding and analysis, I personally believe I am one of the leaders in the Office in investigating cases. I have frequently rated highly as the lead investigator in many of the cases. I have always gotten high marks on my ability to gather and summarize facts; I have been a leader throughout the country in conciliating cases. Both Washington and Boston have assigned me difficult cases such as major lending cases. I have been able to conciliate the majority of the cases assigned me

Page 3 of 7 pages

Initials *KJH*

Exhibit *L*
Page *2* of *7*

in the Boston Office. As far as skills in personal computers, I will be the first to admit I am not the greatest in personal computers but investigators investigate cases, not computers. However I do have sufficient computer ability to do the work I have to do. Until recently computers never played a big role in our office but now all cases put into a system called _____. Overall I believe my experience should have caused me to be ranked in the top on the quality ranking factors and I did receive a letter stating I was on the best-qualified list. I do no know if I was on the actual promotion submitted to the selecting official. The letter telling me I was on the best-qualified list also stated that Linda Tuttle was the selectee. I do not know if there was a rating panel but I believe Ms. Brown called all the supervisors from the other three divisions into her office to discuss the applicants. I believe Ms. Marcella Brown was the selecting official but that Eva Plaza, the Assistant Secretary of HUD for Fair Housing and Equal Opportunity, would have the final say.

I was never told why I was not selected nor did I inquire. I was not certain whom I could talk to about the non-selection. I am not the type of person would go and argue over the non-selection but I did feel bad when I found out Ms. Tuttle had been selected because I knew of her limited background. Dujring the time she has been in the Office she has received a substantial of training, training that I believe was designed to enhance her skills because she had so few years of experience. I have not received much training in recent years and I was told because my skills did not need enhancing.

I believe my race was the reason I was not selected. Under employment discrimination law, when there is a person of a protected class and he or she is qualified

Page 4 of 7 pages                                                                 Initials _QJH_

Exhibit _U_
Page _4_ of _8_

or more qualified than a member of a non-protected class, and that member is selected, it means that there was either pretext in selecting that person or discrimination, or both. In this complaint, it is shocking that a person with less experience, less years of service at HUD and less education would be selected over someone like me who has been here for twelve years, years of education with three college degrees, and who has an outstanding performance record as an investigator.

Ms. Tuttle, who is White, has been in HUD for only three to four years at most and has only worked in the Intake Division. In my judgment the skills acquired by working in the Intake Division are substantially less than those acquired by working in Investigations. The work done in the Investigation Division is what Washington looks at. It is our work that leads to conciliation of a complaint or is passed on to the Justice Department. Throughout the years it was known that the key people in Fair Housing were in the investigative units. I believe that any one leaving Investigations for another Division would in effect be taking demotion.

In addition to my twelve years of experience as an investigator, I worked in the Justice Department in my later years in law school. I have received numerous awards and my performance evaluations were always highly satisfactory or outstanding for the six or eight years. I received two awards from the Assistant Secretary in 1996 and 1998. Over the last several years I received awards for exemplary performance in the handling of special cases. Because of my experience, during the last three or four years, the more complicated cases with unique questions of law were assigned to me. I have a bachelor's

Page 5 of 7 pages                                                    Initials $\mathcal{RJH}$

degree in psychology and sociology, a master's degree creating an urban _Development_. *Planning* RPH

I have a certificate in forensic science. I have a JD degree from Antioch University. I believe that this experience and education makes me better qualified than Ms. Tuttle. I do however want it to be noted for the record that I really like Ms. Tuttle. She is a very nice person and I had a good work relationship with her. But it should also be noted that one month after getting the position she left the Department and the position remains unfilled.

Following her promotion to the position there dissatisfaction over the selection and a number of the minority employees were quire upset and were considering filing a class action. Over the years promotion opportunities had always gone to White employees, never minority employees. The filling of the Public Trust Specialist position provided an opportunity for promotion of a minority to a higher graded non-supervisory position but again, a White employee was selected.

The selecting official for positions such as the Public Trust Specialist the last two years has been Marcella Brown. She has been in her position only two years, since 1998. Soon after she came to this office, Anziah Craig and I went to her office for a meeting. Mr. Craig, as my immediate supervisor, spoke in my behalf that based on my record, he would like to see me promoted to a GS-13. There was a lengthy discussion and she was asked to look into the policy in Washington about getting me a GS-13. Time passed and finally Ms. Brown got in touch with Mr. Craig who informed me that Washington has stated, "the Boston Office has too many upper level positions", meaning GS-13s and above. Because of this they could not give me a GS-13. I find it ironic because the

Page 6 of 7 pages

Initials/RJH

Exhibit _C_
Page _C_ of _8_

person who preceded Ms. Brown, _____White, was removed from his position and made a GS-_____ investigator in this Office. In the Fall of 1998 a GS-13 HUD employee, White, in Albuquerque New Mexico, and who used to work in the Boston Office, was allowed to come back to our Office as a GS-13 investigator. Also, a former GS-12 Boston FHEO employee, White, transferred to Washington, was promoted to a GS-13, and was brought back to Boston as a GS-14. And this was after I had been told the Boston Office could not have any more GS-13s because the Boston Office was too top heavy.

I have read the above statement consisting of seven pages and it is true and correct to the best of my belief and recollection. I have been provided the opportunity to make changes, corrections, additions and deletions. I have initialed each page and signed the statement below.

_Russell W Archibald_
(Signature of Affiant)

SWORN AND SUBSCRIBED BEFORE AT SUFFOLK COUNTY, STATE OF MASSACHUSETTS, ME THIS SIXTEENTH DAY OF MAY, 2000

(Signature of Investigator)

Page 7 of 7 pages

Initials _RJA_

Exhibit _6_
Page _1_ of _8_

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

Signature of Interviewer

Signature of Complainant

Date: 5/16/00

Place: Boston, MA

Exhibit 6
Page 8 of 8
Rev 1/9/98

# EXHIBIT 3

## AFFIDAVIT

### STATE OF MASSACHUSETTS
### COUNTY OF SUFFOLK

I, Marcella O. Brown, African-American, GS-15, New England Director of Fair Housing and Equal Opportunity, US Department of Housing and Urban Development, make this statement to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a discrimination complaint filed by Russell Archibald, knowing that this statement may be used as evidence. I understand that this statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby swear that the information I shall give in this investigation is the truth, the whole truth and nothing by the truth.

I have been in this position since February, 1997 and my immediate supervisors are the General Deputy Assistant Secretary and Assistant Secretary for Fair Housing and Equal Opportunity.

I have known Mr. Archibald since October of 1996 when I was reassigned to the Boston Office of Fair Housing and Equal Opportunity.

The position of Public Trust Specialist was a new position and the person selected would continue to perform his or her duties but at an advance level because of the GS-13 grade level. They would also be expected to act in somewhat of leadership role and work on a team, perhaps as a team leader, work with groups and take on additional assignments. The position was described by the Department as one that could lead to a supervisory position.

The vacancy announcement described four quality-ranking factors which I did not have a role in developing. I believe they may have been developed by Human Resources.

I set up a panel of managers consisting of Bob Buzza, Tim Robison, Merryl Gibbs and Amziah Craig. Bob Buzza is the Program Center Director and the others are Branch

PAGE 2 OF 3 PAGES

Exhibit 8
Page 1 of 4

Chiefs. The panel's purpose was to review the applicants for the position, go through the quality ranking factors and to make a recommendation to me, which I passed on to the Assistant Secretary, Ms. Eva Plaza. The panel evaluated the applicants by reviewing the applicants' package and their knowledge of them. They did not interview the individual applicants. All seven applicants worked in the office. The panel functioned independently and gave me a list in rank-order and also gave the name of Linda Tuttle that they would recommend for selection. Ms. Tuttle has worked closely with me on projects and had skills that were better than Mr. Archibald. For example, she had high ability to work in a team, had the ability to be very versatile in her assignments, and she could be give any assignment and complete it independently and successfully. She was assigned to the Intake/Assess Branch but she was also assigned some individual cases to investigate and monitoring responsibility for a Fair Housing enforcement agency which she did without any difficulty. Mr. Archibald preferred working alone; he told me that he does not like to work on a team.

Every Investigator has to know how to use the computer because they are required to use the Teapots system. All investigations are inputted to this system and used throughout the processing of a complaint. Ms. Tuttle had good computer skills and I do not believe Mr. Archibald had any computer skills that could compare to her skills. While he trained in the system, he did not use it. Computer skills are also vital to the investigators position because this office participates in tele-work (working at home) and the staff required to use the computer to input work and communicate with office. I would rate the ability to use the computer system very high because it is part of the investigative process.

Bob Buzza shared some of the strengths and weaknesses of the applicants with me but if details are needed, Mr. Buzza should be interviewed. However, I was provided a summation of the panel's ratings.

The race of Ms. Tuttle was not a factor in her selection. Nor was Mr. Archibald's race a factor in his non-selection.

PAGE 1 OF 3 PAGES

Exhibit 8
Page 2 of 4

I have read the above statement consisting of three pages and it is true and correct to the best of my recollection and belief. I have been provided the opportunity to make corrections, changes, additions and deletions. I have initialed each page and signed the statement below.

(Signature of Affiant)

SUBSCRIBED AND SWORN BEFORE ME AT THE STATE OF
MASSACHUSETTS, COUNTY OF SUFFOLK THIS SEVENTH DAY OF MAY, 2000

(Signature of Investigator)

Exhibit 8
Page 3 of 4

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of HUD employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer                    Signature of Witness (person providing statement)

Date:

Place:

Exhibit 8

Page 4 of 4

# EXHIBIT 4

Affidavit

I, Robert D. Buzza, make the following statement to Ronald McWold, who has identified himself as an investigator under contract to the U.S. Department of Housing & Urban Development charged with investigating a complaint of discrimination in employment made by Russell Archibald.

In late August of 1999, the Boston Hub of the Office of Fair Housing & Equal Opportunity (FHEO) received the Best Qualified List for a GS-13 Public Trust Specialist. The list was prepared by Human Resources in HUD Headquarters. There were seven applicants on the list. Russell Archibald was one of the seven on the list.

In early September of 1999 a panel consisting of four managers in the Boston Office of FHEO -- three Branch Chiefs and the Program Center Director (the affiant) -- reviewed the applications. After one rough cut, the panel made a detailed evaluation of the four highest-ranking candidates. Mr. Archibald was included in the list of four.

The panel discussed the merits of each of the four candidates under each of four Quality Ranking Factors listed in the vacancy announcement. Then each of the candidates was further evaluated on two local factors reflecting the particular needs of this office and the nature of the assignments this office expects the GS-13 to handle. These two local factors can be described as follows:

Exhibit 10
Page 1 of 5

- Demonstrated ability or potential for versatility, including the ability to participate in and lead team investigations, and the ability to react productively to unexpected assignments or changes in routine, especially assignments for which there is no clear model.

- Demonstrated ability or potential for representation outside FHEO, especially the ability to handle assignments requiring oral presentations.

The panel's discussion culminated in a rating for each applicant on each of the six factors. The ratings were made on a scale of 1 - 10, with 10 being the highest score. Where there was not a unanimous agreement on a rating, I determined the rating based on my judgment of the consensus.

Because all four of the top candidates were stationed in FHEO in Boston, the assessment of each with respect to the six factors was made based on first-hand knowledge and observation by the panel members.

The composite scores on the six factors produced a final ranking of the four candidates. Mr. Archibald ranked lowest of the four candidates. We selected the candidate with the highest ranking – Linda Tuttle (white female).

PAGE 2 of 4 PAGES    2

Our ranking of Mr. Archibald reflected the following concerns:

- Mr. Archibald has a long record of refusing to acquire elementary computer and word-processing skills. Quality Ranking Factor Four for this position deals solely with computer skills. The panel agreed unanimously that Mr. Archibald did not merit even an acceptable rating on this factor.

- Mr. Archibald ranked noticeably lower than the other three finalists on the local factor regarding versatility. By his own assertion, he does not work well in team projects. For example, when assigned as a team member on a complaint investigation during the summer of 1999, he advised the Hub Director that he would not participate because he prefers to "work alone." On numerous occasions he has asserted that he prefers working alone.

At no time during the panel's deliberations was the race of any applicant discussed or considered.

Following the panel deliberation, I met with Hub Director Marcella Brown and summarized the panel deliberation. I recommended to her that Linda Tuttle be selected for the position. To the best of my knowledge, she made that recommendation to the Assistant Secretary. At the same time I made a recommendation to Ms. Brown for a comparable GS-13 Public Trust Specialist position in our Hartford Office; I recommended Carl Harris (black male). This position was not included in the panel deliberation because, in contrast to the applicants for the position in Boston, most of the



panel members had no direct experience working with Mr. Harris. To the best of my knowledge, Ms. Brown recommended that the Assistant Secretary select Mr. Harris for the Hartford position. Mr. Harris was selected.

In early 2000, the Boston Hub had opportunity to fill another GS-13 Public Trust Specialist position. The same applicants applied for this position as had applied for the position filled in September (less Linda Tuttle). I recommended to Marcella Brown that that Persis Brown (black female) be selected based on the fact that she was the second-highest-ranking applicant in the earlier panel process. To the best of my knowledge, Marcella Brown recommended to the Assistant Secretary that Persis Brown be selected for the position. She was selected.

I am making this statement subject to the penalties of perjury this 16th day of November, 2000 at Boston, Massachusetts.

Robert D. Buzza

PAGE 4 OF 4 PAGES

4

Bates 10
Page 4 of 5

JAN-03 01 13:31 FROM:                              TO: 509 752 3916      PAGE:02

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **HUD** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____    _____
Signature of Interviewer                 Signature of Witness (person providing statement)

Date: Jan. 5, 2001

Place: Boston, Mass.

Rev. 10/9/98

Exhibit 10

Page 5 of 5

# EXHIBIT 5

## STATEMENT

I, Merryl Gibbs, Program Operations Branch Chief, Office of Fair Housing and Equal Opportunity, US Department of Housing and Urban Development, Boston, Massachusetts, make this statement freely and voluntarily to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a discrimination complaint filed by Russell Archibald, knowing that this statement may be used as evidence. I understand the statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby state:

In the summer of 1999 I served on a panel to evaluate candidates for a position of Public Trust Specialist, GS-13. Also on the panel were Anziah Craig, _____ Robison and Bob Buzza, supervisors in the Boston office of Fair Housing and Equal Opportunity. As best as I can recall the panel got together to discuss candidates and do some informal ratings of a number of candidates. Panel members Messrs. Craig, Robison and I and were advising Mr. Buzza, who was going to advise Ms. Marcella Brown, who I believe was going to advise Headquarters, which made the final selection. I am not certain who in Headquarters made the final selection.

I do nor recall in detail what the panel members looked at, but we discussed the quality ranking factors and other factors that we believed would be necessary to function effectively in the position. I do not believe we rated all the applicants – I believe we informally rated four applicants out of about seven. The four informally rated were Russell Archibald, Persis Brown, Patricia Moreno and Linda Tuttle. A couple of applicants were eliminated partly based on personal knowledge and partly based on what

Page 1 of 3 pages                                                                                     Initials _____

Exhibit _11_
Page _1_ of _3_

they had submitted. With exception of one individual who did not work in the office, I am aware of the race of the applicants: Persis Brown, African-American; Marshall Pendleton, African-American; Mr. Archibald, African-American and Patricia Moreno, White; Mary-Louise Sales, White and Linda Tuttle, White. The final of four group contained two African-Americans, Persis Brown and Russ Archibald and two Whites, Pat Moreno and Linda Tuttle. Linda Tuttle was selected. At no time was the race of the applicants discussed in the panel's deliberations.

The only quality factor levels I can recall were the ones on facility of using computers and one on facility of communications.

As best as I can recall Persis Brown and Linda Tuttle were rated the highest. The third ranked would have been Pat Moreno, followed by Russ Archibald. I believed Linda Tuttle was on top. I, myself, was advocating Persis Brown of my staff. Both Linda Tuttle and Persis Brown had worked directly for me and I was familiar with their abilities. Following the panel's meeting, Mr. Buzza offered advise to Ms. Marcella Brown and she in turn offered advise to Headquarters. I do not know what Mr. Buzza told Ms. Brown and I do not know what Ms. Brown told Headquarters. It should be noted that Persis Brown has since been promoted to the same grade 13 Public Trust Specialist. Carl Harris, and African-American employee, who had also worked directly for me, but who is out-stationed to the Hartford office, has also promoted to the that position. These promotion selections would have been made in Headquarters following recommendations of Bob Buzza and Ms. Brown. The three selected, Linda Tuttle, Persis Brown and Carl Harris, I believe were the best qualified to be promoted to the position of Public Trust Specialist..

Page 2 of 3 pages                                    Initials _____

Exhibit __11__
Page __2__ of __3__

They got their promotions on the basis of their abilities, not on the basis of their race.

I have read the above statement consisting of three pages and I declare under penalty of perjury that it is true and correct to the best of my recollection and belief. I have initialed each page and signed the statement below.

Executed on this _____ day of _____ 2000 _____ .

      (day)                      (month)    (Signature of person

                                                      giving statement)

_____

(Signature of person witnessing above statement_

_____

(Printed or typed name)

Page 3 of 3 pages                                 Initials _____

Exhibit _11_
Page _3_ of _3_

# EXHIBIT 6

## STATEMENT

I, Timothy Robison, White, Chief, Intake Assessment Division, Office of Fair Housing and Equal opportunity, US Department of Housing and Urban Development, Boston, Massachusetts, make this statement freely and voluntarily to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a complaint of discrimination filed by Russell Archibald, knowing that this statement may be used as evidence. I understand that this statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby by state:

I was a member of a panel that evaluated applicants for the position of Public Trust Specialist, GS-13. The position was unique position and new to the Office. We were not looking for a person to come in and do investigations or specific tasks, because the vacancy was a generalist positon that required generalist 'skills. The understanding was that if an internal applicant were selected he or she would remain in their position but would work function at a higher level. The panel was composed of managers in the Office of Fair Housing and Equal Opportunity. With the exception of one applicant, they were all employees of the Office and were known quantities. With regard to the one outside applicant, I do not believe we reviewed his/her application but may have had information related to us from the application package.

I do not recall what was in the vacancy announcement itself. The panel members ranked applicants on factors such as computer knowledge and the ability to work with computers, flexibility in terms of being able to take on new activities, and writing and

Page 1 of 4 pages                                                          Initials

Exhibit 12
Page 1 · 5

analytical skills.

I believe we had five elements on which we had to rate the applicants. I was particularly interested in the applicants' ability to use computers because one of my roles in the Office is to work with the computer systems we use internally. I commented very specifically that at that time that Russell Archibald had very little computer experience and in fact had great difficulty in working with our computer systems. I and the other panel members also discussed Mr. Archibald's flexibility and lack of demonstrated ability to take on different tasks for which he may not have had experience or exposure. I viewed him more as a specialist in investigations rather than a generalist. He did not have a broad or ranging background

Linda Tuttle, who was working for me at the time, and the applicant who was eventually selected, was a person who was very capable working with our computer systems. She came from a background of Program Operations Division and as a result knew a lot about all the various federal programs. She had requested to move into the Intake Assessment Branch, which by its very nature required her to be aware of all the laws on intake and also do some conciliation work. I personally felt she was very versatile and had a demonstrated ability and an interest to take on new assignments and handle them well.

While Linda Tuttle worked for me, and Mr. Archibald worked for Anziah Craig, another panel member, I do not believe either of us advocated for them. While I felt from my personal knowledge that Ms. Tuttle was a very qualified individual, the panel not

Page 2 of 4 pages                                                      Initials

Exhibit 10

Page 2 of 5

only looked at those two, we had several other applicants to evaluate

After the panel concluded its deliberations we ranked the applicants but I do not remember who ranked where. The work of the panel was advisory only. We did not have a deciding role. I believe Bob Buzza made up the list and he may have had some discussion with Marcella Brown. Once the panel gave its input I did not pay any further attention until a selection was made, but I do believe Ms. Brown was the selecting official. I am not certain if Headquarters further reviewed her decision.

At no time did the panel discuss the race of the applicants or was race a factor in out deliberations. I wish to note that two individuals who were involved in process are Black: Anziah, a panel member; and Marcella Brown, the selecting official. I believe my responsibility was to look as the factors to be rated, and to rate individuals who would be the best-qualified individual for the position

Page 3 of 4 pages

Initials

Exhibit 12
Page 3 of 5

I have read the above statement consisting of three pages and I declare that subject to the penalty of perjury it is true and correct to the best of my recollection. I have initialed each page and signed the statement below.

_01/04/01_
(Date)

_____
(Signature of person signing Statement)

_____
(Signature of person witnessing signature)

_William  Howell_
(Typed or printed name)

Page 4 of 4 pages

Initials

Exhibit 12
Page 4 of 5

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of HUD employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer     Signature of Witness (person providing statement)

Date: _01/04/01_

Place: _Boston_

Exhibit 12
Page 5 of 5

# EXHIBIT 7

## STATEMENT

STATE OF MASSACHUSETTS

COUNTY OF SUFFOLK

I. Amziah W. Craig, Black, Chief, Fair Housing Enforcement Branch, GS-14, Fair Housing and Equal Opportunity Division, United States Department of Housing and Urban Development (HUD), make the following statement freely and voluntarily to Ronald R. McWold who has identified himself to me as a contract investigator for JDG Associates, Inc., Investigating a complaint of discrimination filed by Russell Archibald, knowing that this statement may be used as evidence. I understand that this statement is not confidential and may be shown to any interested party. I hereby state:

I have been in my present position since 1992. My immediate supervisor is Robert Buzza and second line supervisor is Marcella Brown. The Complainant in this complaint, Russell Archibald, is one of my subordinates.

I served on a promotion panel for the position of Public Trust Specialist, GS-13 along with Mr. Robison, Ms. Merryl Gibbs and Mr. Bob Buzza, which represented all the supervisors in the office other than Ms. Marcella Brown. The panel developed about five criteria that it used to rate each of the applicants. The applicants were then rated on a scale of one to ten. Each applicant was rated on the same scale. As I recall there were several applicants and with the exception of one, Michelle Green, the six applicants were rated based on the panel's knowledge of the applicants.

As I recall the vacancy announcement had four quality ranking factors. The panel developed criteria to be used to rate each of the applicants and then each applicant was

Page 1 of 4 pages                                                    Initials _Cur_

Exhibit  13
Page  1  of  4

rated on a scale of one to ten. The ratings were based on our knowledge of the applicants and with one exception were applicants within the office. As best as I can recall (I did not keep copies of the process) the candidates were rated on the factors of skill in fact-finding; ability to gather assemble and analyze facts; the ability to communicate clearly and concisely and informatively both orally and in writing; an skill at using personal computers and data base systems. The panel developed its own chart to rate each applicant. The applicants were Mr. Archibald, Pursis Brown, Patricia Moreno, Marshall Pendelton, Mary-Louise Sales, Linda Tuttle and Michelle Green, who was the one applicant not in the office. The panel met as a group and rated each applicant on a scale of one to ten on the factor. Following the panel's deliberations each supervisor had the opportunity to make his or her recommendations. We reviewed the ranking by each supervisor and then added up all the numbers. The supervisors had to defend their numbers by verbally supporting for the number, explaining why we gave that number or rating. Mr. Archibald had been an investigator for several years and I argued pretty strongly that he paid his dues and for a five or six year period of time he was the top producer in my Branch. As I recall, I rated Mr. Archibald higher than any of the other applicants. Mr. Buzz I believe summarized the numbers and made a presentation to Ms. Brown. The panel did not meet with the applicants. I believe that Marcella Brown was the recommending official and her recommendation went to Washington, D.C. for final approval by Eva Plaza.

I am aware that Linda Tuttle was selected. I had not worked with Ms. Tuttle very

Page 2 of 3 pages                                                          Initials ℚ~~

Exhibit 13
Page 2 of 4

much with the exception of one investigation involving the Boston Housing Authority. I believe she had worked with other supervisors in the office. In contrast I had worked Mr. Archibald during all my tenure as a Branch Chief and I rated as a ten on most of the elements. I believe on one element I did not give him a ten. He is an excellent investigator and has done some really fine investigative work under my supervision. He has dealt with some really complex and complicated cases dealing with banking, lending, zoning. Many of the supervisors had not worked with Mr. Archibald as I have but then each supervisor was somewhat limited in their ability to rate the applicants because they had not worked with all of the applicants and did not know the quality or quantity of their work. The structure of the organization was such that Mr. Buzza or Ms. Brown did not have an opportunity to work with Mr. Archibald. I recommended Mr. Archibald over Ms. Tuttle.

I do not recall that race was ever a factor in the panel's deliberations. Race would not have been an appropriate rate factor.

I have read the above statement consisting of three pages and I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I have initialed each page and signed the statement below.

Executed on this 16 th of January , 200Q

      (Day)          (Month)      (Signature of Person giving
                                            statement)

(Signature of person witnessing above statement

JOHN A GEISS
(Printed or typed name)

Page 3 of 3 pages                              Initials

Exhibit  13
Page  3  of  4

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
### FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **HUD** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Interviewer

X _____
Signature of Witness (person providing statement)

Date: _____

Place: _____

Exhibit 13

Page 4 of 4

# EXHIBIT 8

ATTACHMENT A —
Case Number BN 00 01

There were seven applicants on the Best-Qualified list provided to the Boston FHEO Hub by Human Resources. A panel consisting of four managers in FHEO (three Branch Chiefs and the Program Center Director) reviewed the applications. After one rough cut, the panel made a detailed evaluation of the four highest-ranking candidates.

The panel discussed the merits of each of the four candidates under each of the four Quality Ranking Factors listed in the vacancy announcement. Then each of the top four candidates was further evaluated on two local factors reflecting the particular needs of this office and the nature of the assignments this office expects the GS-13 to handle. These two local factors can be described as follows:

- Demonstrated ability or potential for versatility, including the ability to participate in and lead team investigations, and the ability to react productively to unexpected assignments or changes in routine, especially assignments for which there is no clear model.
- Demonstrated ability or potential for representation outside FHEO, especially the ability to handle assignments requiring oral presentations.

The panel's discussion culminated in a rating for each applicant on each of the six factors. The ratings were made on a scale of 1 - 10, with 10 being the highest score. Where there was not a unanimous agreement of a rating, the Center Director determined the rating based on his determination of the consensus.
Because all four of the top candidates are currently stationed in FHEO in Boston, the assessment of each with respect to the six factors was made based on first-hand knowledge and observation.

The composite scores on the six factors produced a final ranking for each of the four candidates. Mr. Archibald received a ranking of 46. We selected the candidate with the highest ranking, which was 57.

Among the reasons for our rankings of the selectee and of Mr. Archibald, the following were particularly notable:

- Mr. Archibald has a long record of refusing to acquire elementary computer and word-processing skills. Quality Ranking Factor Four for this position deals solely with computer skills. The panel agreed unanimously that Mr. Archibald did not merit even an acceptable rating on this factor.
- Mr. Archibald ranked noticeably lower than the other three finalists on the local factor regarding versatility. By his own assertion, he does not work well in team projects. When assigned as a team member on a complaint investigation during the summer of 1999, he advised the Hub Director that he would not participate because he prefers to "work alone."

Exhibit 14
Page 1 of 1

# EXHIBIT 9



| | **JOB DETAILS** | | HELP HOME |
|---|---|---|---|
| | Exit to USAJobs | Exit to Customer Survey | Print Info |

Use BACK on your browser to return to Job Search Results.

```
USAJOBS                                                    CONTROL NO IF5958
-----------------------------------------------------------------------FM
PUBLIC TRUST SPECIALIST
                                      OPEN PERIOD 07/28/1999 - 08/13/1999
SERIES/GRADE: GS-1101-13/
SALARY: $ 53,793 TO $ 69,930, ANNUAL      PROMOTION POTENTIAL: GS-13
ANNOUNCEMENT NUMBER:  00-PTO-1999-0101AZ

HIRING AGENCY: HUD, ASST SEC FOR FAIR HOUS AND EQUAL OPPOR
DUTY LOCATIONS: 0001  ATLANTA GEORGIA,    GA
                0001  BOSTON MASSACHUSETTS, MA
                0001  DENVER COLORADO, CO

REMARKS: RESTRICTED TO CURRENT HUD EMPLOYEES WITH COMPETITIVE STATUS APPLICANTS
         MUST SUBMIT AN APPLICATION FOR EACH LOCATION OF INTEREST AND INDICATE
         ON APPLICATION BESIDE THE VACANCY NUMBER THE DESIRED LOCATION.




CONTACT:          PTO MERIT STAFFING TEAM
                  PHONE: (202) 708-0395

                  HUD
                  451 7TH STREET, SW
                  ROOM 2258
                  ATTN:  00-PTO-1999-0101AZ
                  WASHINGTON, DC  20410
```

Full vacancy announcement follows. Please be sure to review for complete
qualification and "How to Apply" information.

```
                        Vacancy Announcement
        DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)
              HUD, ASST SEC FOR FAIR HOUS AND EQUAL OPPOR

Vacancy Announcement Number: 00-PTO-1999-0101AZ

Opening Date:  07/28/1999
Closing Date:  08/13/1999

Position:  PUBLIC TRUST SPECIALIST
```

Exhibit 15

Page 1 of 4

GS-1101-13

Salary: $53793 per year - $69930 per year

Promotion Potential: GS-13

Duty Location: 1 vacancy at ATLANTA GEORGIA, GA

               1 vacancy at BOSTON MASSACHUSETTS, MA

               1 vacancy at DENVER COLORADO, CO

Greensboro, NC, Hartford, CT, Kansas City, KS, Milwaukee, WI, Philadelphia, PA, Pittsburgh, PA

Applications will be accepted from:

Restricted to Current HUD employees with Competitive Status

Major Duties:  This opportunity is designed for employees interested in becoming a Fair Housing Equal Opportunity Public Trust Specialist (PTS).  PTS positions are established in each major program areas within the Department and throughout the country.  PTS positions will focus 'front -line' attention to protecting the public's interest in the administration of HUD programs. The incumbent will have responsibility for the most complex program monitoring and management responsibilities.

The Public Trust Specialist is responsible for safeguarding the public trust in communities and organizations receiving HUD administered funds within the field office jurisdiction.  The mission of the Public Trust Specialist is to ensure that federal funds are used appropriately and in compliance with the applicable laws and regulations.  The effectiveness of the HUD 2020 Management Reform effort is dependent upon restoring the publics' trust in HUD's ability to efficiently manage and allocate its resources.  The Public Trust Specialist is integral to this effort and, as such, must develop the skills necessary to lead and assist in this transformation.  Selectees will be provided unique training opportunities and assignments involving national and Department-wide initiatives.

In addition to performing PTS responsibilities,  the individuals selected will be leaders and experts in Fair Housing and Equal Opportunity programs, and will specialize in one or more of the following:  program analysis, intake/assessment, enforcement, compliance, or program operations.  They  are critical to building the HUD organization, expanding the capabilities of our human resource potential, and capable of dealing with the most complex and difficult issues confronting the Agency.

As a member of the HUD's cadre of PTO employees, the incumbent will be expected to attend and complete training courses designed to enhance the essential competencies necessary to perform the functions of a Public Trust Specialist/Officer.

Qualifications Required:

Applicants must meet the selective factor(s) listed below and possess one year of experience equivalent to the next lower grade, in the Federal Service, in the normal line of progression, that is typically related to the work of this position.

Exhibit 15

Page 2 of 4

SELECTIVE PLACEMENT FACTOR

1. Ability to analyze and solve problems related to the technical interpretation and application of Title VIII of the Civil Rights Act of 1968,

Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act of 1974, Section 3 of the Housing and Urban Development Act of 1968, Section 504 of the Rehabilitation Act of 1973, Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act, and the Fair Housing Act, policies, procedures and standards.
2. Extensive knowledge of the programs and initiatives of the Office of Fair Housing and Equal Opportunity.

Applicants must meet all time-in-grade and qualification requirements within 30 calendar days after the closing date of this announcement

Knowledges, Skills and Abilities Required:
APPLICANTS ARE REQUIRED TO LIST EACH QUALITY RANKING FACTOR SEPARATELY AND PROVIDE A NARRATIVE DESCRIPTION OF THEIR EXPERIENCE  TO THE FACTORS BELOW. APPLICANTS WILL NOT RECEIVE CONSIDERATION IF THIS ADDITIONAL INFORMATION IS NOT SUBMITTED.

QUALITY RANKING FACTORS:

1.  Skill in fact-finding analysis, formulating and presenting recommendations and negotiating resolutions of complex issues.
   2.  Ability to gather, assemble and analyze facts, draw conclusions and devise solutions to assigned problems.
   3.  Ability to communicate clearly, concisely and informatively both orally and in writing.
   4. Skill in using personal computers and data base systems.

Basis of Rating:

Eligible candidates meeting the minimum qualification requirements and the selective placement factors, if applicable, candidates will be further evaluated in accordance with the HUD-AFGE's negotiated merit promotion procedures by comparing each candidate's total background with the items listed above.  These items are assigned values and defined by a crediting plan.  This rating process will determine who will be referred to the selecting official.

POINTS FOR AWARDS AND PERFORMANCE APPRAISAL:

A maximum of four additional points overall may be credited for awards and performance appraisals related to one or more of the QRFs listed in the vacancy announcement.  Failure to provide a narrative description of how a candidate's awards and performance appraisal relates to the QRFs will result in no credit for these items.

Pay, Benefits and Work Schedule:
All Federal employees are required by PL 104-134 to have federal payments made by Direct Deposit.

Conditions of Employment:
Other Information:

· All applicants MUST be a United States Citizen.
· This position is a Bargaining Unit.
· This position is exempt from the Fair Labor Standards Act, as amended.
· HUD IS A SMOKE FREE ENVIRONMENT.
· If selected, male applicants born after December 31, 1959, must confirm their selective service registration status.  Certification forms are available at most Federal agency personnel offices or from the Office of Personnel Management (OPM).

Exhibit 15

· Positions in the Federal service are subject to investigation. You may be asked to complete the necessary investigative form (SF-85, SF-85P, or SF-86) to meet that requirement.
· Applications of candidates eligible for non-competitive reassignment or repromotion will be referred to the selecting official simultaneously with the Selection Roster and their names will be placed on a separate Selection Roster annotated as appropriate "NON-COMPETITIVE REASSIGNMENT, REPROMOTION, TRANSFER, REINSTATEMENT ELIGIBLES." Selecting officials may choose a candidate from either Selection Roster.
· ALL APPLICANTS ARE REQUIRED TO SUBMIT THEIR MOST RECENT PERFORMANCE APPRAISAL.
· Applicants must meet all time-in-grade and qualification requirements within 30 calendar days after the closing date of this announcement.
· Applicants should clearly indicate all experience (including dates and number of hours spent per week), training, education, and awards relevant to the qualification requirements. Training or self development activities must reflect course title, classroom hours completed and date(s). DO NOT SEND POSITION DESCRIPTIONS.


How To Apply:
Applications must be received by the closing date of the announcement to receive consideration.

        Please submit the following documents to the address provided in this announcement:

    (1) A written application for employment. You may use OF-612 (Optional Application for Federal Employment), a resume, or submit an alternative format. You must include all of the information specified in this vacancy announcement and all information listed in the Office of Personnel Management's brochure "Applying for a Federal Job (OF-510). Applications must be Typed or Printed clearly in dark ink.

    (2) Narrative assessment of your qualifications in terms of the Knowledge, Abilities, Skills and Other Characteristics (KASOCS) identified within this announcement. Describe experience (paid or unpaid), education, training and self-development as related to the KASOCS.


Faxed materials will not be accepted.


APPLICANTS MUST SUBMIT AN APPLICATION FOR EACH LOCATION OF INTEREST AND INDICATE BESIDE THE VACANCY NUMBER THE DESIRED LOCATION.

APPLICATIONS MUST BE RECEIVED BY THE CLOSING DATE IN HEADQUARTERS OR IN THE LOCAL OFFICE WHERE THE VACANCY IS LOCATED.

For additional information about this position please contact:
Contact:              PTO MERIT STAFFING TEAM
                      202-708-0395
Please submit your application package to:
                      HUD
                      451 7TH STREET, SW
                      ROOM 2258
                      ATTN:  00-PTO-1999-0101AZ
                      WASHINGTON, DC   20410


The Federal Government is an Equal Opportunity Employer.

Exhibit  15
Page  4 of 4

# EXHIBIT 10

HUD

⌐⌐⌐ AUG 12 P 3: 55

U.S. Dept. of HUD
PTO Merit Staffing Team
451 7th Street, Room 2258
ATTN: 00-PTO-1999-0101AZ
Washington, DC 20410

Russell J. Archibald

J.                          519

August 9, 1999

To Whom it May Concern:

Please accept my application for the Public Trust Specialist
position in the Boston Office of Fair Housing and Equal
Opportunity.

For many years, I have had a strong interest in policy
matters regarding the enforcement of Fair Housing Laws, beginning
in the early 1970's while working on my Master's Degree in
Community Planning and Development at the University of Rhode
Island.  Most of my two years in Graduate School involved
studying the difficulties of formulating public policies in
relation to the social environment.  My Master's Degree gave me
an overview of the many problems facing society in the future and
stimulated a deeper understanding of the human problems
associated with planning for society in the future.  My thesis
topic, 'Planning Implications to High Vacancy Rates in Public
Housing", was a two year study of the social and physical
problems surrounding three public housing projects in Providence,
Rhode Island.

Soon after Graduate School, I was appointed Assistant
Director of the Rhode Island Training School for Boys and Girls
(Juvenile Detention Facility).  Along with the administrative
duties of my position, I became acutely aware of the role the
environment played on the youth of Rhode Island and the changes
it would take to create a more healthy environment for them.
After several years in this administrative position, I was asked
by the Mayor of Providence to join his Department of Community
Development as Director of Housing.  In this position, I was
responsible for the long and short term planning for the city's
housing needs.  My duties also included overseeing all federal
monies awarded for new housing and the rehabilitation of public
and private housing.  I was also responsible for monitoring
compliance with Title VI, Title VII and Title VIII of the Civil
Rights Act.

In 1976, I attended Law School in Washington, D.C.  My
three years of Law School afforded me an opportunity to get a
well rounded background in all phases of the criminal justice
system.  My studies included courses in criminal law and criminal
procedures along with several evidentiary courses.  Upon__

Exhibit _16_

Page _1_ : 20

graduation, I accepted a position in the U.S. Justice Department, Civil Rights Division, Criminal section. I was responsible for working on cases involving violation of individual's civil rights.  In the Justice Department, I worked on preliminary investigations of the Civil Rights Act violations.  I prepared justification memoranda, arguing factually and persuasively the reasons for settling or litigating the matter.  The memoranda set forth background, summary, studies, statistics, a discussion of the facts and the law, any possible weaknesses in the case and recommendations as to whether and how to proceed in the matter. In addition, I interviewed and deposed potential witnesses and parties to litigation, and obtained details of any complaint made with local, state or federal agencies.  Working in the Justice Department allowed me to get a good background in federal litigation.  My responsibilities in the Criminal Section of the Civil rights Division included investigating cases where individuals civil rights were violated by landlords, realtors and excessive force by police officers.

In August 1988, I was appointed to the position of Civil Rights Analyst/Investigator in the Boston Regional Office of Fair Housing and Equal Opportunity, Compliance Division of the U.S. Department of Housing and Urban Development.

As an Investigator/Civil Rights Analyst in the Fair Housing Office for Region I, I take the lead in the conduct of complaint investigations, compliance reviews, negotiations, and conciliation's.  I do this in accordance with civil rights laws and executive orders and established Departmental regulations, directives, and procedures.  I investigate complaints both from the office and in the field by interviewing complainants, respondents and witnesses.  I research records, documents and past practices; analyze facts; draw conclusions, write timely reports and make recommendations for subsequent action by the Department. I also routinely participate in conciliation activities when there is sufficient evidence to support the allegation of discrimination.  The cases I am assigned are normally characterized by the following: (1) involve individuals and/or organizations which are moderate in size and/or complexity; (2) substantial or controversial questions of fact or interpretation of law; (3) unusual situations or unexpected developments which have occurred; (4) circumstances which require personal ability to overcome unresponsiveness or hostility; and (5) difficult multiple issues.  I am very proud of the success rate I hold as an investigator in this office.

Please consider this and the attached information and accept my application for this position.  I can be reached at (617) 565-5312 if you further questions.

Sincerely,

Russell J. Archibald

Exhibit _16_

Page _3_ of _20_

## RUSSELL ARCHIBALD

## EXPERIENCE HIGHLIGHTS

| | |
|---|---|
| 1988 - Present | **United States Department of Housing and Urban Development**<br>Responsible for conducting investigations of complaints alleging discrimination in the rental, sale, and financing of housing and conducting compliance reviews to ensure that applicable Civil Rights Laws and fair housing requirements are adhered to in HUD's housing and community development programs. |
| 1986 - 1988 | **Consultant to Islands of the Eastern Carribean**<br>Assembled database for each of the islands of the Lesser Antilles. Responsible for analyzing data covering a broad spectrum of information to enable policymakers, technicians and field personnel at the island level to appreciate the inter-relatedness of the socio-economics of development activity. |
| 1984 - Dec.1985 | **B & F Construction Co., Inc.**<br>Responsible for the day to day operations of a general construction company. Primary responsibilities included negotiations and administration of contracts and agreements. |
| 1981 - 1984 | **Consultant to Islands of the Eastern Carribean** |
| Mar. 1979 - June 1980 | **United States Justice Department, Civil Rights Division**<br>Law Clerk.In March of 1979, I received a one-year appointment to the Civil Rights Division. This appointment, to the Civil Rights Division, afforded me the opportunity to get first-hand trial and appellate experience in a vital, developing area of the law. The clerkship allowed me to gain knowledge of all phases of Federal practice including many important questions of Constitutional and statutory construction. |
| 1975 - 1976 | **City of Providence, Community Development**<br>Director of Housing Programs. Responsible for overseeing numerous housing programs in the City of Providence. Responsible for assembling information about project areas before long range development plans were started. |
| 1973 - 1975 | **State of Rhode Island, Department of Corrections**<br>Assistant Director of the Rhode Island Training School for Boys and Girls. In 1973, I was appointed Assistant Director of Rhode Island Training Schools. As administrator of the detention facility, I was responsible for overseeing the services and treatment programs set up to prepare boys/girls for successful reintegration into the mainstream of society. |
| 1971 - 1973 | **University of Rhode Island Graduate School**<br>Graduate Research Assistant. Served as a consultant to the State Legislature on Urban Affairs. Work concerned writing reports on social problems confronting State Agencies. |

Exhibit  16

Page  3  of  20

1969 - 1971

State of Rhode Island, Department of Corrections
Probation Counselor.  Interviewed delinquents, giving individual and
group counseling sessions. Worked with youths and their parents to help
understand themselves and others better.    Assisted in securing
employment and other necessary services for youth with problems.

## EDUCATION

University of Rhode Island
BA Sociology and Psychology, 1971
B average.  On Dean's list on several occasions.  A good preparation in
Liberal Arts Education with emphasis on Social Psychology and Urban
problems.

University of Rhode Island
MCP in Urban Planning, 1973
Completed program of courses leading to specialization in Urban Problem
Areas.   MCP based on 66 Graduate credits with a 3.0 average and a
thesis.

Antioch School of Law, Washington, D.C.
J.D., 1980
While attending Antioch, I was chosen for the Law Journal and appointed
editor of the "Law and Society" section.  In 1979, I represented the law
school in a National Moot Court competition where I won the "Best Brief
Competition."

## AWARDS

- Dean's List - University of Rhode Island (Undergraduate)
- Recipient of H.U.D. Fellowship (Graduate School)
- Law and Society Editor on Law Journal (Antioch)
- Award for "Best Brief" in National Moot Court Competition
- Numerous Athletic Awards

## PUBLICATIONS

Planning Implications to High Vacancy Rates in Public Housing
This was a two-year study which investigated the social and physical
problems which deterred people from living in Public Housing.

Revitalization of Economically Depressed Areas
A look at the economic and social factors which affect living in the South
Providence area.  The study looked for ways of improving the economic
problems created by absentee landlords and declining business district.

"Mandamus to Correct and Illegal Sentence"
Law Review Article.  Comment on the U.S. v. Denson case.

Exhibit __16__
Page __4__ of __80__

# Performance Appraisal

U.S. Department of Housing
and Urban Development

| Employee Name | Social Security Number | Organization Segment | Organization Code |
|---|---|---|---|
| Russell Archibald | | FHEO/Enforcement | IAEHPE |

| Position Title | Series and Grade | Dates of Appraisal Period | Date Rating Made |
|---|---|---|---|
| Civil Rights Analyst | GS 12-360 | From 02/01/98  To  01/31/99 | 2/23/99 |

| ☐ GM (Performance Management and Recognition System) | ☐ GS (General Schedule) | ☐ WG (Wage Grade) | ☒ GS -AFGE | ☐ WG -AFGE |
|---|---|---|---|---|

Rating Official (Signature & Date)  _Jungish W. Craig_ 2/23/99

Reviewing Official (Signature & Date)  2/23/99

Employee (Signature & Date)  _Russell J Archibald_ 3/20/99

Note: Employee signature indicates only that the rating has been discussed with the employee and does not signify agreement or disagreement with the rating.

Progress Review: Employee's initials indicate only that the progress review meeting was held. They do not indicate agreement or disagreement with the results.

## Element Ratings

| Critical Element No. | Outstanding | Highly Successful | Fully Successful | Marginally Successful | Unacceptable |
|---|---|---|---|---|---|
| 1 | X | | | | |
| 2 | | X | | | |
| 3 | | X | | | |
| 4 | X | | | | |
| 5 | X | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Review Dates | Supervisor's Initials | Employee's Initials |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## Summary Ratings

☐ Outstanding   ☑ Highly Successful   ☐ Fully Successful   ☐ Marginally Successful   ☐ Unacceptable

☐ Employee is Unratable (PMRS Only). State Reason:

Sensitive Information: The information collected on this form is considered sensitive and is protected by the Privacy Act. The Privacy Act requires that these records be maintained with appropriate administrative, technical, and physical safeguards to ensure their security and confidentiality. In addition, these records should be protected against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom the information is maintained.

Previous editions are obsolete

# QUALITY RANKING FACTORS

Exhibit __16__
Page _6_ of 20

Skill in fact-finding analysis, formulating and presenting recommendations and negotiating resolutions of complex issues.

As an investigator/civil rights analyst in Region 1, my responsibilities include investigating individual complaints filed with our office, and systemic complaint processing. Systemic complaint processing is an investigative technique designed to address pervasive or institutional discriminatory housing practices as part of the expanded focus of an individual Title VIII complaint investigation. This type of investigation provides the Department with the opportunity to achieve a greater remedial or deterrent effect in addition to the individual relief obtained for the complaint.

Systemic processing of complaints has two ultimate goals. First it insures an in depth investigation of the complaint which will hopefully assure a satisfactory remedy to any violation of the rights of the aggrieved person should the complaint reach conciliation. Secondly, if the complaint does reach the conciliation stage, the investigator can negotiate a conciliation agreement which will also seek to protect the interests of the Complainant's class and the public interest.

Practices of redlining by lending institutions, racial steering, and zoning issues are usually the type of cases appropriate for systemic processing because of their impact on minorities, women, families with children, and the handicapped. In order to adequately investigate any of these practices one must be skilled at collecting and analyzing demographic and statistical data. My urban planning and law background enhance my ability to deal effectively with these more complex cases. The use of statistics as a systemic investigative tool further enhances the quality of my Final Investigative Reports.

Presently, the New England Region does not have a systemic branch. Although I work under the supervision of the Enforcement Branch Chief much of the investigative planning and actual investigation are left to me because of my experience and senior position with in the Branch. As a civil rights analyst I am responsible for collecting and developing sufficient evidence to support or disprove allegations of discrimination. I regularly draft subpoenas and interrogatories. My duties include reviewing systemic

Exhibit _16_
Page _7_ of _20_

case files to determine whether the quality and quantity of evidence is legally sufficient to support a determination to resolve the complaint. In many cases I coordinate my efforts with the Regional Counsel's office throughout the investigative process to ensure compliance with applicable laws, regulations, and HUD policy.

Over the years I have handled several of the more complex and politically explosive cases in the region. Several that come to mind are Santiago v Greenfield Housing Authority (residency preferences), NEARI v MIFA (zoning) and Harbor Schools Inc. v Town of Newbury/ State of Massachusetts (group home). These cases along with many others I have been assigned involved complex and novel issues dealing with controversial siting of group homes and land use/zoning issues. A considerable number of these cases conciliated for amounts in excess of $50,000, and the NEARI case for $160,000.

Lending cases are another area in which I have had considerable success within the New England Region and on several occasions at the request of Headquarters in Washington other regions. Two of the more highly publicized cases were the Shawmut Bank case that settled for about one million dollars and more recently the Countrywide Mortgage Corporation case. At the request of the Director of Investigations Sara Pratt I was asked in 1997 to head up a team to investigate Countrywide Mortgage Corp. whose head office is in Pasadena,CA for alleged lending discrimination. Countrywide is probably the largest mortgage company in the United States. The case was filed in Washington as a result of testing that was done by NAFA with a grant from HUD. After over a year of in depth interviews, document review and on site visits to California the case was resolved.

I consider myself an experienced investigator within the Enforcement Branch with outstanding investigative skills and techniques.

Exhibit __16__

Page __8__ of __20__

Ability to gather, assemble, and analyze facts, draw conclusions and devise solutions to assigned problems.

As mentioned in my response to the first quality ranking question as an investigator in the Enforcement Branch a considerable amount of time is spent investigating housing discrimination complaints. Part of the work involves interviewing officials of management companies and officials of public housing authorities. These onsite visits require analyzing practices and researching office records. Quite often eviction cases are based on policy decisions and management practices, which are in conflict with discrimination laws. My job is to analyze these practices and uncover evidence of whether or not there are violations of the Fair Housing Act. To perform effectively, I must have a thorough knowledge of the Law and management's programs and practices.

In many cases I am assigned seemingly neutral housing policies designed to protect the health and safety of tenants in fact often protect dominant values and morals, not the physical or emotional well-being of minority groups. Consequently they discriminate against the latter. An example is local, state, and federal housing policies define bedroom and acceptable sleeping arrangements. While often considered universal such sleeping arrangements are entwined with social values.

As an investigator I am often assigned a case which has as it's basis a discriminatory occupancy policy. These cases usually allege a violation based on familial status. These cases which usually call for a unique remedy are complicated by cultural differences which inevitably surface. The dominant U.S. concept of what constitutes proper sleeping arrangements are entwined with fundamental values by which people live such as the socially constructed importance accorded to individualism and physical privacy, as well as what constitutes crowding or overcrowding.

Some of the more dramatic impacts of a non-critical acceptance of current housing policy in relation to discriminatory practice are high-lighted in many private and governmental guidelines. Close scrutiny of a comparison of Asian, Hispanic and American homes points out the basis of societal misfits that leads to discrimination. If one would study the living situations

Exhibit _16_

Page _9_ of _20_

of many of the foreign born families now living in the U.S. we could see the ramifications and have cause for a reassessment at the federal and local levels of what constitutes "reasonable occupancy standards" under the Fair Housing Act. An argument could be made that particular person-to-bedroom ratios written into many regulations should be found to be discriminatory on the basis of national origin, race, and familial status.

Housing is far more than just a physical structure which functions as shelter from the elements and other people. It is an integral part of one's personal, social, and ethnic identity. Therefore, the insistences that minorities conform to the dominate U.S. concepts of appropriate space if they are to participate in governmental programs is in reality a highly charged, but subtle political decision. Coming from both a sociological and law background the problems of numerous policies provides a general framework for questioning these polices and suggesting remedies. Housing advocates and attorneys are starting to use the arguments presented here concerning the social construction of domestic space for enforcing the Fair Housing Act.

Thorough knowledge of problem-solving techniques and a high level of skill in interpreting laws, executive orders, regulations, and court decisions have allowed me to work successfully in the Enforcement Branch.

Exhibit 16
Page 10 of 20



## ABILITY TO COMMUNICATE EFFECTIVELY ORALLY AND IN WRITING

I pride myself on being an effective communicator as both a speaker and a writer, an ability I began to acquire as early as high school and have nurtured continuously since.

My position at the Department of Justice required me to prepare justification memoranda, which argued factually and persuasively the reasons for settling or litigating Civil Rights matters. My written memoranda set forth summaries, backgrounds, statistical and case study data, factual and legal discussions which supported my recommendations as to how to proceed with a case. Many times, in addition to the written memoranda, I would also have to orally discuss the matter with coworkers and supervisors, using my oral communication skills to assert my position on a case.

My position as an Investigator with the Department of Housing and Urban Development requires me to routinely prepare Final Investigative Reports, which need to be concise, convincing and clear reports of all aspects of the case on which I am working. These reports in written form sharply describe the position of the parties, the witnesses and parties interviewed, the documents collected and their significance to the case, as well as lengthy discussion in a deliberative section, including legal reasoning used for the basis of the recommendation. I am effective in communicating my belief that there is or is not reasonable cause to believe that the Fair Housing Act has been violated. I also must communicate in written form to other divisions within HUD; including requests for policy or legal clarification on issues outside my expertise.

As was the case in my position with the Department of Justice, in HUD I am often required to communicate orally with other agency employees. For instance, in the course of a case investigation, I often have lengthy discussions with the attorneys in the Legal Division assigned to the same cases, orally presenting and arguing my position. In cases which involve policy matters unfamiliar to me, I need to communicate orally with employees in those respective areas in order to form an understanding of the policies at hand and how they relate to my particular case. Due in large part to my ability to communicate orally with others, I have an excellent working relationship with many other employees throughout the HUD family, providing me with a network of information when needed.

I have represented the HUD FHEO Office on numerous occasions at civic meetings and seminars, lecturing on the changes in the Fair Housing Act laws which took effect in March of 1988. Over the years, I have also lectured to various State Human Rights Commissions and other Federal agencies on these and other Fair Housing Act law changes and issues. I have on occasion assisted with Fair Housing Act violation trials in Federal District Court, testifying as an expert interpreter of the Fair Housing Act laws on the behalf of the agency.

I have also, for many years, been highly successful using my oral communication skills in conciliating fair housing, civil rights, and affirmative action cases.

Exhibit _16_

Page _11_ of _20_

Skill in using personal computers and data base systems

My primary duties in the Enforcement Branch involve investigating and conciliating discrimination complaints. In the course of working on cases valuable information is stored on an investigator's personal computer.

I do not consider myself well versed in all applications of the computer, but I am capable of handling basic tasks. I use my personal computer every day for creating, editing, and completing Final Investigative Reports(FIRs), memos, and letters in connection with Title VIII cases to which I am assigned. I also access email on a daily basis and the internet as needed to aid in my research of fair housing issues and precedent case information.

Exhibit __16__
Page _1Y_ of _20_

## Selective Placement Factor

In 1988 Congress enacted fair housing legislation that expanded the government's enforcement powers and provided additional protection for victims of housing discrimination.

The Fair Housing Amendments Act of 1988 added a new administrative mechanism for resolving disputes and for granting individuals access to judicial relief for discrimination.

HUD was given the authority to administer the Act, and HUD and other executive departments and agencies were directed to administer their programs in a manner to further the purposes and policies of Title VIII.

As enacted in 1968, Title VIII prohibited housing discrimination because of race, color, religion, or national origin. In 1974, Title VIII was amended to include sex among the protected classes. Over the next decade, housing discrimination against two other unprotected classes emerged as national problems. These were handicapped persons and families with children.

In the 1988 Amendments and Section 504 of the Rehabilitation Act of 1973, the prohibition against a refusal to allow a disabled person to make reasonable modifications to existing units is an essential element this expanded the supply of barrier free residential housing. The Amendments seek a balance between making rental units accessible to handicapped persons and minimizing the cost to landlords.

For a number of years there has been public recognition that the proliferation of "adults only" complexes exacerbated the housing shortage for families with children. The 1988 Amendments now bar discrimination on the basis of familial status. Unlike the disabled provisions, there is nothing in the law that requires the construction or adaptation of units to accommodate families with children. The prohibition against discrimination requires that housing be made available to families with children where the unit is appropriate in size.

The Fair Housing Amendments Act strengthened considerably the enforcement methods available under Title VIII. Private litigation was retained and the statute of limitations was increased from 180 days to two years. Ceiling on punitive damages have been eliminated and compensatory damages remain as additional available relief.

Important as the provisions are that strengthened Title VIII enforcement and Department of Justice lawsuits significant enforcement changes took place with respect to complaints to HUD. The 1988 Amendments increased the statute of limitations for complaints from 180 days to one year. Second, it authorizes HUD to file a complaint on its own initiative, thereby altering HUD's posture from passive complaint recipient to that of active

Exhibit __16__

Page __13__ of __20__

complaint initiator.

The Department (HUD) can now secure the imposition of heavy civil penalties against housing discriminators, and obtain monetary damages as well as injunctive relief for aggrieved persons.

The Fair Housing Amendments Act of 1988 has made major changes in Title VIII.  The Federal Fair Housing Law now has the potential to be a much more effective instrument for attacking housing discrimination comprehensively and forcefully.

The provisions broadened coverage to include handicapped persons and families with children.

The requirement that multifamily housing constructed in the future be accessible to persons who are handicapped is of special significance.  The above-mentioned provisions along with Section 504 give additional tools to the fight to rid society of housing discrimination.

Exhibit _16_

Page _14_ of _20_

Points for awards and performance appraisal

Beginning in 1993 and in each subsequent year I received outstanding performance evaluations from the Director of the Enforcement Branch here in Boston. As a result I have been awarded six(6) certificates for excellence in performance.

In March 1996 and again in October of 1998 I received the Assistant Secretary's Special Recognition Award in recognition of extraordinary contributions to achieving the objectives of Fair Housing and Equal Opportunity.

The reasons given for receiving the outstanding evaluations and awards are my ability to work independently with minimum supervision on many of the more complex and politically explosive cases throughout our region. Over the years I have negotiated settlements in fair housing complaints involving controversial group home cases and land use and zoning cases that involved complex and novel issues. A considerable number of the cases conciliated for amounts in excess of $50,000.00. The settlement amounts achieved in several of these cases were higher than those achieved by DOJ through court action.

Lending discrimination cases are another area to which I have had great success both within the New England Region and on several occasions at the request of the headquarters office in Washington. Two of the more highly publicized cases were the Shawmut bank case that settled for about one million dollars and more recently the Countrywide Mortgage Corporation case.

On more than one occasion I have been assigned a group home complaint that involved complex issues of first impression and highly sensitive political and emotional matters ,both from Complainants' and the Respondents' point of view. There were citizens in these communities who opposed the siting of the residences and the elected officials were responding to the pressures exerted by the electorate. The amounts of the settlements and the interest they generated in the press provided a message to other communities throughout Region 1 that opposition to group residences that is based on the handicap status of the occupants is illegal.

Exhibit 16
Page 16 of 20

U.S. Department of Housing and Urban Development
Fair Housing and Equal Opportunity

# Assistant Secretary's Award

*Achievement in Civil Rights Enforcement*

## *Russell Archibald*

In recognition for exceptional service to the
Office of Fair Housing and Equal Opportunity.



Eva M. Plaza
Assistant Secretary for
Fair Housing and Equal Opportunity
October 1998

Exhibit *16*
Page *16* of *20*

# Assistant Secretary's
# Special Recognition

## Russell J. Archibald

*In recognition of extraordinary contributions toward achieving
the objectives of Fair Housing and Equal Opportunity.*

Elizabeth K. Julian
Deputy Assistant Secretary for
Policy and Initiatives

March 1996

Exhibit _16_

Page _17_ of _20_

U.S. Department of Housing
and Urban Development
Office of Human Resources

## A. Award Processing

| 1. Effective Date (mm/dd/yy) | 2. NOAC | | 3. Legal Authority | 4. Case No. |
|---|---|---|---|---|

1. Effective Date (mm/dd/yy): 01/98
2. NOAC: 877
3. Legal Authority: 4503-OTS   V 3F - 5 U.S.C.
4. Case No.:

5. Type of Award Recommended
- a. Performance
- b. Superior Accomplishment (Special Act or Service)
- c. [X] Spot
- d. Time-Off
- e. Suggestion
- [X] Individual
- Group

6. No. of Persons Receiving the Award: 1

## B. Employee Information/Recommendation

| 7. Employee's Name (last, first, middle initial) or Name of Group | 8. Social Security No. | 9. Pay Plan, Grade/Step | 10. Position Title | 11. Bargaining |
|---|---|---|---|---|
| Archibald, Russell J. | | )-12/07 | E.O. Specialist | [X] Yes ___ No |

| 12. Organization | 13. Organization Code | 14. Budget Code | 15. Appropriation Code |
|---|---|---|---|
| FHEO/Enforcement Branch | 1AEEE | 1AEEE | 86 801 43 |

16. Type and Date of Awards received within current fiscal year
NA

| 17. Complete this block if you checked 5b or e | 18. Tangible First Year Savings | 19. Recommended Award | 20. Total Amount Approved (Group) | 21. Amount Per Person |
|---|---|---|---|---|
| ___ Tangible Benefits <br> ___ Intangible Benefits | | $300.00 | 300.00 | |

| 22. Signature and Title of Recommending Official or Suggestion Program Officer | Date | 25. Period of Accomplishment (dates) |
|---|---|---|
| Amziah W. Craig, Chief Enforcement Branch 1AEHPE | 06/18/98 | From 04/15/98   To 06/15/98 |

24. Award Justification (attach additional sheets if necessary)

23. Date of award approval by HCER/OIG

During the two-month period ending June 15, 1998, Mr. Archibald completed the
investigation and conciliation of several significant complaints involving novel and
complex issues of law and facts. He successfully conciliated those complaints resulting
in significant changes in the policies and practices of the respondents against whom the
complaints were filed and he was instrumental in negotiating monetary damages on behalf
of the complainants valued in excess of $90,000. Accordingly, a spot award of $300 is
deserving in this case.

## C. Award Approval/Concurrence (someone other than Recommending Official or Suggestion Program Officer)

| 26. Division Director | Date | 27. Office Director | Date |
|---|---|---|---|
| Robert D. Buzze, Director FHEO Program Center, 1AEHP | 4/15/98 | Marcella G. Brown, Director Boston HUB, 1AEH | 4/15/98 |

| 28. Assistant Secretary (or equivalent) | Date | 29. Secretary or Designee (if applicable) | Date |
|---|---|---|---|
| | | | |

| 30. Signature of Authorized Human Resources Official (if required) | Title | Date |
|---|---|---|
| | PHES | 7-1-98 |

31. Special Handling Instructions:

Exhibit 16
Page 18 of 22

Previous edition is obsolete

dard Form 50-8
7/91
Office of Personnel Management
Supp. 296-33, Subch. 4

Case 1:04-cv-10503-MEL    Document 21-2    Filed 05/15/2007    Page 65 of 77

Exception to SF 50-8
approved by GSA/IRMS 2-87

# NOTIFICATION OF PERSONNEL ACTION

| ame (Last, First, Middle) | | 2. Social Security Number | 3 Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| CHIBALD, RUSSELL JOHN | | ( | | 16/07/99 |

**1ST ACTION**

| | -B. Nature of Action |
|---|---|
| 8 | PERFORMANCE AWARD |

| Code | 5-D. Legal Authority |
|---|---|
| 4R | 5 USC 4505A |

| Code | 5-F. Legal Authority |
|---|---|
| | |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

**FROM: Position Title and Number**

**15. TO: Position Title and Number**
EQUAL OPPORTUNITY SPECIALIST
000269AF    000269

| Plan | 9. Occ Code | 10.Grade/Level | 11.Step/Rate | 12. Total Salary | 13. Pay Basis | 16 Pay Plan | 17. Occ Code | 18.Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21 Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 1,320.00 | |

| Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | | .00 | | .00 |

| Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | HOUSING AND URBAN DEVELOPMENT NEW ENGLAND BOSTON AREA OFFICE BAO, FHEO |

**EMPLOYEE DATA**

| Veterans Preference | | | | 24 Tenure | | 25 Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|---|
| 1 - None | 3 - 10 Point/Disability | 5 - 10 Point/Other | | 1 | 0 - None  2 - Conditional | | YES  ☒ NO |
| 2 - 5 Point | 4 - 10 Point/Compensable | 6 - 10 Point/Compensable/30% | | | 1 - Permanent  3 - Indefinite | | |

| FEGLI | 28. Annuitant Indicator | 29 Pay Rate Determinant |
|---|---|---|
| BASIC-STANDARD-1X ADDITIONAL | 9    NOT APPLICABLE | 0 |

| ant Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| FERS AND FICA | 01/20/88 | F    FULL TIME | |

**POSITION DATA**

| Position Occupied | 35 FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General  2 - Excepted Service  4 - SES Career Reserved | E    5 - Exempt  N - Nonexempt | | 0015 |

| Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 25-0120-025 | BOSTON  SUFFOLK  MA |

| AGENCY DATA | 41. | 42. | 43. | 44 |
|---|---|---|---|---|
| | | | | |

**Remarks**

RFORMANCE AWARD
LARY BLOCK CONTAINS CASH AWARD AMOUNT.

| ing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| HOUSING AND URBAN DEVELOPMENT | Exhibit 16 |

| Agency Code | 48. Personnel Office ID | 49 Approval Date | FREDERICK KUEHN |
|---|---|---|---|
| HU 83 | 4401 | 06/24/98 | HUMAN RESOURCES OFFICER  Page 19 of 20 |

URN OVER FOR IMPORTANT INFORMATION
Part    50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6236

1 - Employee Copy - Keep for Future Reference

8301010500008160500    PP 12 1*1998*BATCH 44015563 000-00 200-69 AG/EO 83-4401

Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

Case 1:04-cv-10503-MEL    Document 21-2    Filed 05/15/2007    Page 66 of 77

Exception to SF 50-B
approved by GSA/IRMS 2-87

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| ARCHIBALD, RUSSELL JOHN | | | 09/27/98 |

| FIRST ACTION | | | SECOND ACTION | | |
|---|---|---|---|---|---|
| 5-Code | 5-B. Nature of Action | | 6-A. Code | 6-B. Nature of Action | |
| | SPECIAL ACT OR SERVICE AWARD | | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority | |
| V3G | 5 USC 4503 | | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | EQUAL OPPORTUNITY SPECIALIST |
| | 000269AF    000269 |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 300.00 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | | .00 | | .00 |

| 14. Name and Location of Position's Organization | 32. Name and Location of Position's Organization |
|---|---|
| | HOUSING AND URBAN DEVELOPMENT |
| | NEW ENGLAND |
| | BOSTON AREA OFFICE |
| | BAO, FHEO |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 - None    3 - 10 Point/Disability    5 - 10 Point/Other | 0 - None    2 - Conditional | | YES    ☒ NO |
| 1    2 - 5 Point    4 - 10 Point/Compensable    6 - 10 Point/Compensable/30% | 1    1 - Permanent    3 - Indefinite | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| H    BASIC-STANDARD-1X ADDITIONAL | 9    NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| 2    FERS AND FICA | 01/20/88 | F    FULL TIME | Biweekly Pay Period |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service    3 - SES General    1    2 - Excepted Service    4 - SES Career Reserved | E    E - Exempt    N - Nonexempt | | 0015 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) | | |
|---|---|---|---|
| 25-0120-025 | BOSTON    SUFFOLK    MA | | |

| 40. Agency Data | 41. | 42. | 43 | 44 |
|---|---|---|---|---|
| | | | | |

**45. Remarks**

PECIAL ACT OR SERVICE AWARD
ALARY BLOCK CONTAINS CASH AWARD AMOUNT.

| 4 Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| H    JING AND URBAN DEVELOPMENT | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | FREDERICK KUEHN |
| HU 83 | 4401 | 10/15/98 | HUMAN RESOURCES OFFICER |

TURN OVER FOR IMPORTANT INFORMATION
5-Part    50-316          1 - Employee Copy - Keep for Future Reference

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-5238

Exhibit 16
Page 20 of 20

U 830101050008160500    PP 20 1*1998*BATCH 44015547 000-00 200-42 AG/EO 83-4401

# EXHIBIT 11

Exhibit 18
Page 1 of 1

# Rating Worksheet

**U.S. Department of Housing and Urban Development**
Office of Personnel and Training

| Vacancy Number | Panel Date |
|---|---|
| 00-PTO-1999-0101AZ – Boston | 08/27/99 |

Title, Series, and Grade: Public Trust Specialist, GS-1101-13

**QRF Points**
9 = Outstanding   6 = Above Average   3 = Average
A maximum of 2 points may be credited for Awards and Performance Appraisals

| | Archibald R | Brown | Green M | Marano P | Pendleton M | Sales M | Tuttle L |
|---|---|---|---|---|---|---|---|
| QRF Skill in fact-finding analysis, formulating & presenting recommendations & negotiating ... | 9 | 1 | 6 | 6 | 6 | 6 | 9 |
| QRF Ability to gather, assemble & analyze facts, draw conclusions & devise solutions to assigned ... | 9 | 9 | 6 | 7 | 9 | 9 | 9 |
| QRF Ability to communicate clearly, concisely & informatively both orally and in writing. | 9 | 9 | 9 | 7 | 6 | 6 | 9 |
| QRF Skill in using personal computers and data base systems. | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| QRF | | | | | | | |
| QRF | | | | | | | |
| QRF | | | | | | | |
| QRF Benchmark Point Total | 33 | 30 | 27 | 27 | 27 | 27 | 33 |
| Awards | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Performance Appraisal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Awards and Performance Appraisal Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Employee Point Total | 33 | 30 | 27 | 27 | 27 | 27 | 33 |

70% of Maximum QRF Benchmark Points = 25

**Documentation**
Ten or fewer qualified candidates. Rating and Ranking conducted by Personnel Representative IAW AFGE Contract, Article 13, Section 13.10, Number (3)(c). All candidates meeting the 70% cutoff, which is 25 points, will be referred. Therefore, points for awards and performance appraisal will not be given.

Signatures of Panel Members

Signature of Personnel Representative

JEFF D. LAMMERS

# EXHIBIT 12

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF PERSONNEL AND TRAINING
**SELECTION ROSTER**

VACANCY NUMBER:
00-PTO-1999-0101AZ

| POSITION, TITLE, SERIES, GRADE(S), ORGANIZATION, AND LOCATION | DATE REFERRED TO SELECTING OFFICIAL | DATE RECEIVED BY PERSONNEL FROM SELECTING OFFICIAL |
|---|---|---|
| Public Trust Specialist, GS-1101-13, Office of Fair Housing and Equal Opportunity  Boston | 08/27/99 | |

**CERTIFICATION BY PANEL MEMBERS:**

By my signature, I certify that I have not discriminated on the basis of race, color, creed, age, national origin, sex, marital status, lawful political or group affilation, or nondisqualifying physical handicap in identifying these candidates as being Best Qualified.

| 1. DATE  08/27/99 | PERSONNEL REPRESENTATIVE  Ten or fewer qualified candidates. Rating and Ranking conducted by Personnel Representative IAW AFGE Contract, Article 13, Section 13.10, Number (3)(c). | 2. DATE | SELECTING OFFICIAL, OR DESIGNEE WHO PARTICIPATES ON PANEL |
|---|---|---|---|
| 3. DATE | PANEL MEMBER | 4. DATE | PANEL MEMBER |
| 5. DATE | PANEL MEMBER | 6. DATE | PANEL MEMBER |

**BEST QUALIFIED CANDIDATES**

| NAME | INTERVIEW YES | INTERVIEW NO | REMARKS | ACTION TAKEN |
|---|---|---|---|---|
| 1. Archibald, Russell | | N | Black | NS |
| 2. Brown, Persis | | N | Black | NS |
| 3. Green, Michele | | N | Black | NS |
| 4. Moreno, Patricia | | N | White | NS |
| 5. Pendelton, Marshall | | N | Black | NS |
| 6. Sales, Mary-Louise | | N | White | NS |
| 7. Tuttle, Linda | | N | White | S |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

**CERTIFICATION BY SELECTING OFFICIAL:**

☐ By my signature below, I certify that I have not unlawfully discriminated in selecting the Best Qualified candidate indicated by the "S" in ACTION TAKEN column.

☐ No selection made. *(Briefly explain.)*

☐ Other. *(Briefly explain.)*

Exhibit 19

Page 1 of 1

| DATE  9/22/99 | SIGNATURE OF DESIGNEE WHO CONDUCTS SELECTION INTERVIEWS  Marcella Brown | DATE  9/22/99 | SIGNATURE OF SELECTING OFFICIAL |
|---|---|---|---|

PREVIOUS EDITION IS OBSOLETE

HUD-154 (3-86)

# EXHIBIT 13



 **Tess Miragias**
10/01/99 09:44 AM
• • • • • • • • • • • • • • • • • • • • • • • • • • • •

To:    Linda Tuttle/FHEO/BOS/HUD@HUD
cc:    Marcella Brown/FHEO/BOS/HUD@HUD, Timothy M. Robison/FHEO/BOS/HUD@HUD, Yvette Nimmons
       Killebrew/FHEO/HHQ/HUD@HUD, Barbara J. Henson/ADMIN/HHQ/HUD@HUD, Jeff D.
       Lahmers/ADMIN/CLE/HUD@HUD
Subject: 00-PTO-1999-0101Az

This confirms your selection for the position of Public Trust Specialist, GS-1101-13, in the Office of
Fair Housing and Equal Opportunity, Massachusetts State Office. Your promotion will be effective
October 10, 1999. Your new salary will be set as a GS-13, step 1, at $58,807 per annum.

I wish to extend my congratulations on your selection.

Exhibit  20
Page  1  of  1

# EXHIBIT 14

## ANSWERS TO INTERROGATORIES

| | |
|---|---|
| In the matter of : | ) |
| | ) |
| Russell Archibald | ) |
| Complainant | )    BN-00-01 |
| | ) |
| vs. | ) |
| | ) |
| United States Department of Housing | ) |
| and Urban Development | ) |

I, Eva M. Plaza, hereby swear that the information to the following questions are true and complete to the best of my knowledge and recollection.

1. Please provide your current position title, grade and duty station.

Assistant Secretary for Fair Housing and Equal Opportunity, EX-03-01-04-000, HUD Headquarters, Washington, DC

2. If in this assignment for less than two years, what was your prior federal position, title, grade and duty location.

N/A

3. What is your race?

Hispanic

4. Do you know Mr. Russell Archibald, an employee assigned to the Boston Fair Housing and Equal Opportunity Enforcement Unit, and if so, how did you come to know him?

No, I do not know Mr. Archibald.

5. What is your supervisory relationship to him, i.e., the level of supervision above his position?

I serve as the top management official for the Office of Fair Housing and Equal Opportunity at HUD. The Complainant reports to supervisory staff below me.

6. Mr. Archibald alleges that because of his race, African-American, he was non-selected for a position of Public Trust Specialist, GS-13, in the Boston Office.

PAGE 1 OF 4 PAGES

Exhibit 9
Page 1 of 4

a. What is your knowledge of the establishment of this position and what role did you have in authorizing the publication of the vacancy announcement?

I did not play a role in authorizing the publication of the vacancy announcement for this position. The Deputy Secretary's Office established and authorized the vacancy announcement for this position. The Public Trust Officer staffing initiative was established by the Secretary to create promotional and leadership opportunities for long-standing HUD employees. The Assistant Secretaries were given authority by the Secretary to serve as the selecting officials for the Public Trust positions announced in their respective program offices. Guidance was provided by the Deputy Secretary, which directed the Assistant Secretaries to address certain issues during the selection process, such as staffing deficiencies and inefficiencies, and lack of promotional opportunities in within their offices. These positions were filled within FHEO in accordance with the Department's rules and authority for this staffing initiative.

b. He alleges a panel of supervisors in the Boston office rated the candidates for the position. What role did you play in the selection of the panel? If none, who selected the panel?

According to Ms. Marcella Brown, the Boston Hub Director, a panel consisting of four managers in the Boston Office convened to rank the best-qualified applicants for this position. Based on the collective recommendation of this panel, Ms. Brown, presented the recommendation to me through Mr. Floyd May for selection. Please see the attached document marked "Attachment A," which provides Ms. Brown's detailed explanation of the internal process the Boston Office used for the review and recommendation of the applicants for this position.

c. The vacancy announcement lists the following quality ranking factors for the position:

1. Skill in fact-finding, analysis, formulating and presenting recommendations, and negotiating resolutions of complex issues.
2. Ability to gather, assemble and analyze facts, draw conclusions and devise solutions to assigned problems.
3. Ability to communicate clearly, concisely and informatively both orally and in writing.
4. Skill in using personal computers and data base systems.

From you knowledge of the position, do these factors represent a fair basis for evaluating the experience of the candidates?

Yes, the majority of the work we do in FHEO involves fact-finding, conducting investigations, analytical thinking, making determinations and conclusions, problem solving and extensive oral and written communication. Familiarity with, and

PACE 2 OF 4 PAGES

Exhibit 9
Page 2 of 4

experience with using personal computers and data base systems are important factors as well, since our reporting and record-keeping systems are computerized and a great deal of our internal and external communications are conducted via computerized systems. One of the reasons Mr. Archibald was not recommended for this position, according to Ms. Marcella Brown, is his refusal to acquire basic computer and word-processing skills.

Is any one factor crucial for effective performance in the position? Please explain.

No, I believe all of the factors, collectively, are crucial for effective performance of the position.

d.  What role did you have in selecting the quality ranking factors, and if none, who selected them?

The quality ranking factors were prepared by the Office of Operations and Management within FHEO, in conjunction with the Office of Human Resources.

7.  Mr. Archibald alleges that Ms. Marcella Brown recommended to you that Ms. Linda Tuttle be selected for the position:

a.  Is the position of Public Trust Specialist at a level where you would normally be the official who concurs in the selection recommendation? Please explain.

Yes, the Secretary of HUD established the authority for the Assistant Secretaries to serve as the concurring officials on the selection recommendations for the Public Trust positions announced within their respective offices. Therefore, I served as the selecting official for this position and for all of the Public Trust positions announced within FHEO. As such, I received recommendations from the Hub Directors through Mr. Floyd May for all of the positions, including this one.

b.  Did Ms. Brown recommend Ms. Tuttle to you for the position?

Yes, she recommended Ms. Tuttle to me through Mr. Floyd May.

c.  If so, did Ms. Brown provide reasons why she recommended Ms. Tuttle.

Yes, Mr. Brown provided reasons for her recommendation.

What was the basis for her recommendation?

Please see the attached document marked "Attachment A," which Ms. Brown provided to me through Mr. Floyd May, supporting her recommendation of Ms. Tuttle for the position.

PAGE 3 OF 4 PAGES

Exhibit  9
Page  3  of  4

d. Were you aware of the race of Ms. Tuttle at the time you concurred in her selection?

No, I was not aware of Ms. Tuttle's race. Ms. Tuttle's race was not a factor in the selection process.

e. Do you have any reason to believe that Ms. Brown used race as a factor in recommending Ms. Tuttle to you?

No, I do not have any reason to believe that race was a factor in Ms. Brown's decision to recommend Ms. Tuttle for the position.

f. Do you have any reason to believe that Ms. Brown used race as a factor in not recommending the selection of Mr. Archibald.

No, I do not have any reason to believe that race was a factor in Ms. Brown's determination not to recommend Mr. Archibald for the position.

8. As best you can recall, please identify the selections of individuals for positions at the GS-13 level, or higher, for which you retained concurrence, for the period 12-97 through 11-99. Please identify by position title, name and race. A separate signed attachment to this interrogatory would be acceptable.

The Office of Administration will supplement a response to this interrogatory. Extensive research of personnel documents in their possession, dating back to 12/97, will be necessary.

I, Eva M. Plaza, state:

I have made the foregoing Answers to Interrogatories on this ____4 th____ day of
_December_ 2000, and know the answers to be true to the best of my knowledge, information and belief.

_Eva m Plaza_
Eva M. Plaza