# EXHIBIT 1

## STATEMENT

I, Timothy Robison, White, Chief, Intake Assessment Division, Office of Fair Housing and Equal opportunity, US Department of Housing and Urban Development, Boston, Massachusetts, make this statement freely and voluntarily to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a complaint of discrimination filed by Russell Archibald, knowing that this statement may be used as evidence. I understand that this statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby by state:

I was a member of a panel that evaluated applicants for the position of Public Trust Specialist, GS-13. The position was unique position and new to the Office. We were not looking for a person to come in and do investigations or specific tasks, because the vacancy was a generalist positon that required generalist 'skills. The understanding was that if an internal applicant were selected he or she would remain in their position but would work function at a higher level. The panel was composed of managers in the Office of Fair Housing and Equal Opportunity. With the exception of one applicant, they were all employees of the Office and were known quantities. With regard to the one outside applicant, I do not believe we reviewed his/her application but may have had information related to us from the application package.

I do not recall what was in the vacancy announcement itself. The panel members ranked applicants on factors such as computer knowledge and the ability to work with computers, flexibility in terms of being able to take on new activities, and writing and

Page 1 of 4 pages                                                          Initials

Exhibit 18

Page 1 of 5

analytical skills.

I believe we had five elements on which we had to rate the applicants. I was particularly interested in the applicants' ability to use computers because one of my roles in the Office is to work with the computer systems we use internally. I commented very specifically that at that time that Russell Archibald had very little computer experience and in fact had great difficulty in working with our computer systems. I and the other panel members also discussed Mr. Archibald's flexibility and lack of demonstrated ability to take on different tasks for which he may not have had experience or exposure. I viewed him more as a specialist in investigations rather than a generalist. He did not have a broad or ranging background

Linda Tuttle, who was working for me at the time, and the applicant who was eventually selected, was a person who was very capable working with our computer systems. She came from a background of Program Operations Division and as a result knew a lot about all the various federal programs. She had requested to move into the Intake Assessment Branch, which by its very nature required her to be aware of all the laws on intake and also do some conciliation work. I personally felt she was very versatile and had a demonstrated ability and an interest to take on new assignments and handle them well.

While Linda Tuttle worked for me, and Mr. Archibald worked for Anziah Craig, another panel member, I do not believe either of us advocated for them. While I felt from my personal knowledge that Ms. Tuttle was a very qualified individual, the panel not

Page 2 of 4 pages                                                    Initials _____

Exhibit 10
Page 2 of 5

only looked at those two, we had several other applicants to evaluate

After the panel concluded its deliberations we ranked the applicants but I do not remember who ranked where. The work of the panel was advisory only. We did not have a deciding role. I believe Bob Buzza made up the list and he may have had some discussion with Marcella Brown. Once the panel gave its input I did not pay any further attention until a selection was made, but I do believe Ms. Brown was the selecting official. I am not certain if Headquarters further reviewed her decision.

At no time did the panel discuss the race of the applicants or was race a factor in out deliberations. I wish to note that two individuals who were involved in process are Black: Anziah, a panel member; and Marcella Brown, the selecting official. I believe my responsibility was to look as the factors to be rated, and to rate individuals who would be the best-qualified individual for the position

Page 3 of 4 pages

Initials

Exhibit 12
Page 3 of 5

I have read the above statement consisting of three pages and I declare that subject to the penalty of perjury it is true and correct to the best of my recollection. I have initialed each page and signed the statement below.

_01/04/01_
(Date)

_____
(Signature of person signing Statement)

_____
(Signature of person witnessing signature)

_William  Howell_
(Typed or printed name)

Page 4 of 4 pages

Initials _____

Exhibit  12
Page  4  of  5

# PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **HUD** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____     _____
Signature of Interviewer              Signature of Witness (person providing statement)

Date: 01/04/01

Place: Boston

Exhibit 12

Page 5 of 5

Rev. 10/9/98

# EXHIBIT 2

Affidavit

I, Robert D. Buzza, make the following statement to Ronald McWold, who has identified

himself as an investigator under contract to the U.S. Department of Housing & Urban

Development charged with investigating a complaint of discrimination in employment

made by Russell Archibald.

In late August of 1999, the Boston Hub of the Office of Fair Housing & Equal

Opportunity (FHEO) received the Best Qualified List for a GS-13 Public Trust Specialist.

The list was prepared by Human Resources in HUD Headquarters. There were seven

applicants on the list.  Russell Archibald was one of the seven on the list.

In early September of 1999 a panel consisting of four managers in the Boston Office of

FHEO -- three Branch Chiefs and the Program Center Director (the affiant) --  reviewed

the applications.  After one rough cut, the panel made a detailed evaluation of the four

highest-ranking candidates.   Mr. Archibald was included in the list of four.

The panel discussed the merits of each of the four candidates under each of four Quality

Ranking Factors listed in the vacancy announcement. Then each of the candidates was

further evaluated on two local factors reflecting the particular needs of this office and the

nature of the assignments this office expects the GS-13 to handle.  These two local factors

can be described as follows:

- Demonstrated ability or potential for versatility, including the ability to participate in and lead team investigations, and the ability to react productively to unexpected assignments or changes in routine, especially assignments for which there is no clear model.

- Demonstrated ability or potential for representation outside FHEO, especially the ability to handle assignments requiring oral presentations.

The panel's discussion culminated in a rating for each applicant on each of the six factors. The ratings were made on a scale of 1 - 10, with 10 being the highest score.  Where there was not a unanimous agreement on a rating, I determined the rating based on my judgment of the consensus.

Because all four of the top candidates were stationed in FHEO in Boston, the assessment of each with respect to the six factors was made based on first-hand knowledge and observation by the panel members.

The composite scores on the six factors produced a final ranking of the four candidates. Mr. Archibald ranked lowest of the four candidates.  We selected the candidate with the highest ranking – Linda Tuttle (white female).

Our ranking of Mr. Archibald reflected the following concerns:

- Mr. Archibald has a long record of refusing to acquire elementary computer and word-processing skills. Quality Ranking Factor Four for this position deals solely with computer skills. The panel agreed unanimously that Mr. Archibald did not merit even an acceptable rating on this factor.

- Mr. Archibald ranked noticeably lower than the other three finalists on the local factor regarding versatility. By his own assertion, he does not work well in team projects. For example, when assigned as a team member on a complaint investigation during the summer of 1999, he advised the Hub Director that he would not participate because he prefers to "work alone." On numerous occasions he has asserted that he prefers working alone.

At no time during the panel's deliberations was the race of any applicant discussed or considered.

Following the panel deliberation, I met with Hub Director Marcella Brown and summarized the panel deliberation. I recommended to her that Linda Tuttle be selected for the position. To the best of my knowledge, she made that recommendation to the Assistant Secretary. At the same time I made a recommendation to Ms. Brown for a comparable GS-13 Public Trust Specialist position in our Hartford Office; I recommended Carl Harris (black male). This position was not included in the panel deliberation because, in contrast to the applicants for the position in Boston, most of the

panel members had no direct experience working with Mr. Harris. To the best of my knowledge, Ms. Brown recommended that the Assistant Secretary select Mr. Harris for the Hartford position. Mr. Harris was selected.

In early 2000, the Boston Hub had opportunity to fill another GS-13 Public Trust Specialist position. The same applicants applied for this position as had applied for the position filled in September (less Linda Tuttle). I recommended to Marcella Brown that that Persis Brown (black female) be selected based on the fact that she was the second-highest-ranking applicant in the earlier panel process. To the best of my knowledge, Marcella Brown recommended to the Assistant Secretary that Persis Brown be selected for the position. She was selected.

I am making this statement subject to the penalties of perjury this 16th day of November, 2000 at Boston, Massachusetts.


Robert D. Buzza

JAN-03 01 13:31  FROM:                                  TO: 509 752 3916          PAGE:02

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
### FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services.  This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **HUD** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **HUD** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination.  Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer          Signature of Witness (person providing statement)

Date: _Jan. 5, 2001_

Place: _BOSTON, MASS._

Rev. 10/9/98

Exhibit  10

Page  5  of  5

# EXHIBIT 3

AFFIDAVIT

STATE OF MASSACHUSETTS
COUNTY OF SUFFOLK

I, Marcella O. Brown, African-American, GS-15, New England Director of Fair Housing
and Equal Opportunity, US Department of Housing and Urban Development, make this
statement to Ronald R. McWold, who has identified himself to me as a Contract
Investigator for JDG Associates, Inc., investigating a discrimination complaint filed by
Russell Archibald, knowing that this statement may be used as evidence. I understand
that this statement is not confidential and may be shown to any interested party (those
with a legal right to know). I hereby swear that the information I shall give in this
investigation is the truth, the whole truth and nothing by the truth.

I have been in this position since February, 1997 and my immediate supervisors are the
General Deputy Assistant Secretary and Assistant Secretary for Fair Housing and Equal
Opportunity.

I have known Mr. Archibald since October of 1996 when I was reassigned to the Boston
Office of Fair Housing and Equal Opportunity.

The position of Public Trust Specialist was a new position and the person selected would
continue to perform his or her duties but at an advance level because of the GS-13 grade
level. They would also be expected to act in somewhat of leadership role and work on a
team, perhaps as a team leader, work with groups and take on additional assignments.
The position was described by the Department as one that could lead to a supervisory
position.

The vacancy announcement described four quality-ranking factors which I did not have a
role in developing. I believe they may have been developed by Human Resources.

I set up a panel of managers consisting of Bob Buzza, Tim Robison, Merryl Gibbs and
Amziah Craig. Bob Buzza is the Program Center Director and the others are Branch

PAGE 2 OF 3 PAGES

Exhibit 8
Page 1 of 4

Chiefs. The panel's purpose was to review the applicants for the position, go through the quality ranking factors and to make a recommendation to me, which I passed on to the Assistant Secretary, Ms. Eva Plaza. The panel evaluated the applicants by reviewing the applicants' package and their knowledge of them. They did not interview the individual applicants. All seven applicants worked in the office. The panel functioned independently and gave me a list in rank-order and also gave the name of Linda Tuttle that they would recommend for selection. Ms. Tuttle has worked closely with me on projects and had skills that were better than Mr. Archibald. For example, she had high ability to work in a team, had the ability to be very versatile in her assignments, and she could be give any assignment and complete it independently and successfully. She was assigned to the Intake/Assess Branch but she was also assigned some individual cases to investigate and monitoring responsibility for a Fair Housing enforcement agency which she did without any difficulty. Mr. Archibald preferred working alone; he told me that he does not like to work on a team.

Every Investigator has to know how to use the computer because they are required to use the Teapots system. All investigations are inputted to this system and used throughout the processing of a complaint. Ms. Tuttle had good computer skills and I do not believe Mr. Archibald had any computer skills that could compare to her skills. While he trained in the system, he did not use it. Computer skills are also vital to the investigators position because this office participates in tele-work (working at home) and the staff required to use the computer to input work and communicate with office. I would rate the ability to use the computer system very high because it is part of the investigative process.

Bob Buzza shared some of the strengths and weaknesses of the applicants with me but if details are needed, Mr. Buzza should be interviewed. However, I was provided a summation of the panel's ratings.

The race of Ms. Tuttle was not a factor in her selection. Nor was Mr. Archibald's race a factor in his non-selection.

PAGE 1 OF 3 PACES

Exhibit 8
Page 2 of 4

I have read the above statement consisting of three pages and it is true and correct to the best of my recollection and belief. I have been provided the opportunity to make corrections, changes, additions and deletions. I have initialed each page and signed the statement below.

(Signature of Affiant)

SUBSCRIBED AND SWORN BEFORE ME AT THE STATE OF MASSACHUSETTS, COUNTY OF SUFFOLK THIS SEVENTH DAY OF MAY, 2000

(Signature of Investigator)

PAGE 3 OF 3 PAGES

Exhibit  8
Page  3  of  4

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
### FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL
This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY
The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES
The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *HUD* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE
Disclosure of the information sought is voluntary; however, failure on the part of **HUD** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____     _____
Signature of Interviewer            Signature of Witness (person providing statement)

Date: _____

Place: _____

Exhibit 8
Page 4 of 4

# EXHIBIT 4

4

# ANSWERS TO INTERROGATORIES

In the matter of :                              )
                                                )
Russell Archibald                               )
Complainant                                     )        BN-00-01
                                                )
        vs.                                     )
                                                )
United States Department of Housing             )
and Urban Development                           )

I, Eva M. Plaza, hereby swear that the information to the following questions are true and complete to the best of my knowledge and recollection.

1.  Please provide your current position title, grade and duty station.

Assistant Secretary for Fair Housing and Equal Opportunity, EX-03-01-04-000, HUD Headquarters, Washington, DC

2.  If in this assignment for less than two years, what was your prior federal position, title, grade and duty location.

N/A

3.  What is your race?

Hispanic

4.  Do you know Mr. Russell Archibald, an employee assigned to the Boston Fair Housing and Equal Opportunity Enforcement Unit, and if so, how did you come to know him?

No, I do not know Mr. Archibald.

5.  What is your supervisory relationship to him, i.e., the level of supervision above his position?

I serve as the top management official for the Office of Fair Housing and Equal Opportunity at HUD.  The Complainant reports to supervisory staff below me.

6.  Mr. Archibald alleges that because of his race, African-American, he was non-selected for a position of Public Trust Specialist, GS-13, in the Boston Office.

a. What is your knowledge of the establishment of this position and what role did you have in authorizing the publication of the vacancy announcement?

I did not play a role in authorizing the publication of the vacancy announcement for this position. The Deputy Secretary's Office established and authorized the vacancy announcement for this position. The Public Trust Officer staffing initiative was established by the Secretary to create promotional and leadership opportunities for long-standing HUD employees. The Assistant Secretaries were given authority by the Secretary to serve as the selecting officials for the Public Trust positions announced in their respective program offices. Guidance was provided by the Deputy Secretary, which directed the Assistant Secretaries to address certain issues during the selection process, such as staffing deficiencies and inefficiencies, and lack of promotional opportunities in within their offices. These positions were filled within FHEO in accordance with the Department's rules and authority for this staffing initiative.

b. He alleges a panel of supervisors in the Boston office rated the candidates for the position. What role did you play in the selection of the panel? If none, who selected the panel?

According to Ms. Marcella Brown, the Boston Hub Director, a panel consisting of four managers in the Boston Office convened to rank the best-qualified applicants for this position. Based on the collective recommendation of this panel, Ms. Brown, presented the recommendation to me through Mr. Floyd May for selection. Please see the attached document marked "Attachment A," which provides Ms. Brown's detailed explanation of the internal process the Boston Office used for the review and recommendation of the applicants for this position.

c. The vacancy announcement lists the following quality ranking factors for the position:

1. Skill in fact-finding, analysis, formulating and presenting recommendations, and negotiating resolutions of complex issues.
2. Ability to gather, assemble and analyze facts, draw conclusions and devise solutions to assigned problems.
3. Ability to communicate clearly, concisely and informatively both orally and in writing.
4. Skill in using personal computers and data base systems.

From you knowledge of the position, do these factors represent a fair basis for evaluating the experience of the candidates?

Yes, the majority of the work we do in FHEO involves fact-finding, conducting investigations, analytical thinking, making determinations and conclusions, problem solving and extensive oral and written communication. Familiarity with, and

experience with using personal computers and data base systems are important factors as well, since our reporting and record-keeping systems are computerized and a great deal of our internal and external communications are conducted via computerized systems. One of the reasons Mr. Archibald was not recommended for this position, according to Ms. Marcella Brown, is his refusal to acquire basic computer and word-processing skills.

Is any one factor crucial for effective performance in the position? Please explain.

No, I believe all of the factors, collectively, are crucial for effective performance of the position.

    d. What role did you have in selecting the quality ranking factors, and if none, who selected them?

The quality ranking factors were prepared by the Office of Operations and Management within FHEO, in conjunction with the Office of Human Resources.

7. Mr. Archibald alleges that Ms. Marcella Brown recommended to you that Ms. Linda Tuttle be selected for the position:

    a. Is the position of Public Trust Specialist at a level where you would normally be the official who concurs in the selection recommendation? Please explain.

Yes, the Secretary of HUD established the authority for the Assistant Secretaries to serve as the concurring officials on the selection recommendations for the Public Trust positions announced within their respective offices. Therefore, I served as the selecting official for this position and for all of the Public Trust positions announced within FHEO. As such, I received recommendations from the Hub Directors through Mr. Floyd May for all of the positions, including this one.

    b. Did Ms. Brown recommend Ms. Tuttle to you for the position?

Yes, she recommended Ms. Tuttle to me through Mr. Floyd May.

    c. If so, did Ms. Brown provide reasons why she recommended Ms. Tuttle.

Yes, Mr. Brown provided reasons for her recommendation.

What was the basis for her recommendation?

Please see the attached document marked "Attachment A," which Ms. Brown provided to me through Mr. Floyd May, supporting her recommendation of Ms. Tuttle for the position.

PAGE 3 OF 4 PAGES

Exhibit 9
Page 3 of 4

d. Were you aware of the race of Ms. Tuttle at the time you concurred in her selection?

No, I was not aware of Ms. Tuttle's race. Ms. Tuttle's race was not a factor in the selection process.

e. Do you have any reason to believe that Ms. Brown used race as a factor in recommending Ms. Tuttle to you?

No, I do not have any reason to believe that race was a factor in Ms. Brown's decision to recommend Ms. Tuttle for the position.

f. Do you have any reason to believe that Ms. Brown used race as a factor in not recommending the selection of Mr. Archibald.

No, I do not have any reason to believe that race was a factor in Ms. Brown's determination not to recommend Mr. Archibald for the position.

8. As best you can recall, please identify the selections of individuals for positions at the GS-13 level, or higher, for which you retained concurrence, for the period 12-97 through 11-99. Please identify by position title, name and race. A separate signed attachment to this interrogatory would be acceptable.

The Office of Administration will supplement a response to this interrogatory. Extensive research of personnel documents in their possession, dating back to 12/97, will be necessary .

I, Eva M. Plaza, state:

I have made the foregoing Answers to Interrogatories on this _____ 4 th _____ day of December, 2000, and know the answers to be true to the best of my knowledge, information and belief.

_____
Eva M. Plaza

PAGE 4 OF 4 PAGES

Exhibit    9
Page    4 of 4

# EXHIBIT 5

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF PERSONNEL AND TRAINING
**SELECTION ROSTER**

| POSITION, TITLE, SERIES, GRADE(S), ORGANIZATION, AND LOCATION | DATE REFERRED TO SELECTING OFFICIAL | DATE RECEIVED BY PERSONNEL FROM SELECTING OFFICIAL |
|---|---|---|
| Public Trust Specialist, GS-1101-13, Office of Fair Housing and Equal Opportunity  Boston | 08/27/99 | VACANCY NUMBER: 00-PTO-1999-0101AZ |

**CERTIFICATION BY PANEL MEMBERS:**

By my signature, I certify that I have not discriminated on the basis of race, color, creed, age, national origin, sex, marital status, lawful political or group affilation,  or nondisqualifying physical handicap in identifying these candidates as being Best Qualified.

| 1. DATE  08/27/99 | PERSONNEL REPRESENTATIVE  Ten or fewer qualified candidates. Rating and Ranking conducted by Personnel Representative IAW AFGE Contract, Article 13, Section 13.10, Number (3)(c). | 2. DATE | SELECTING OFFICIAL, OR DESIGNEE WHO PARTICIPATES ON PANEL |
|---|---|---|---|
| 3. DATE | PANEL MEMBER | 4. DATE | PANEL MEMBER |
| 5. DATE | PANEL MEMBER | 6. DATE | PANEL MEMBER |

**BEST QUALIFIED CANDIDATES**

| NAME | INTERVIEW YES | INTERVIEW NO | REMARKS | ACTION TAKEN |
|---|---|---|---|---|
| 1. Archibald, Russell | | N | Black | NS |
| 2. Brown, Persis | | N | Black | NS |
| 3. Green, Michele | | N | Black | NS |
| 4. Moreno, Patricia | | N | White | NS |
| 5. Pendelton, Marshall | | N | Black | NS |
| 6. Sales, Mary-Louise | | N | White | NS |
| 7. Tuttle, Linda | | N | White | S |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

**CERTIFICATION BY SELECTING OFFICIAL:**

☐ By my signature below, I certify that I have not unlawfully discriminated in selecting the Best Qualified candidate indicated by the "S" in ACTION TAKEN column.

☐ No selection made. *(Briefly explain.)*

☐ Other. *(Briefly explain.)*

Exhibit 19

Page 1 of 1

| DATE  9/22/99 | SIGNATURE OF DESIGNEE WHO CONDUCTS SELECTION INTERVIEWS  Marcella Brown | DATE  9/22/99 | SIGNATURE OF SELECTING OFFICIAL |
|---|---|---|---|

PREVIOUS EDITIONS OBSOLETE                                        HUD-154 (3-86)

# EXHIBIT 6

## STATEMENT

I, Merryl Gibbs, Program Operations Branch Chief, Office of Fair Housing and Equal Opportunity, US Department of Housing and Urban Development, Boston, Massachusetts, make this statement freely and voluntarily to Ronald R. McWold, who has identified himself to me as a Contract Investigator for JDG Associates, Inc., investigating a discrimination complaint filed by Russell Archibald, knowing that this statement may be used as evidence. I understand the statement is not confidential and may be shown to any interested party (those with a legal right to know). I hereby state:

In the summer of 1999 I served on a panel to evaluate candidates for a position of Public Trust Specialist, GS-13. Also on the panel were Anziah Craig, _____ Robison and Bob Buzza, supervisors in the Boston office of Fair Housing and Equal Opportunity. As best as I can recall the panel got together to discuss candidates and do some informal ratings of a number of candidates. Panel members Messrs. Craig, Robison and I and were advising Mr. Buzza, who was going to advise Ms. Marcella Brown, who I believe was going to advise Headquarters, which made the final selection. I am not certain who in Headquarters made the final selection.

I do nor recall in detail what the panel members looked at, but we discussed the quality ranking factors and other factors that we believed would be necessary to function effectively in the position. I do not believe we rated all the applicants – I believe we informally rated four applicants out of about seven. The four informally rated were Russell Archibald, Persis Brown, Patricia Moreno and Linda Tuttle. A couple of applicants were eliminated partly based on personal knowledge and partly based on what

Page 1 of 3 pages                                                        Initials _____

Exhibit  11
Page  1  of  3

they had submitted. With exception of one individual who did not work in the office, I am aware of the race of the applicants: Persis Brown, African-American; Marshall Pendleton, African-American; Mr. Archibald, African-American and Patricia Moreno, White; Mary-Louise Sales, White and Linda Tuttle, White. The final of four group contained two African-Americans, Persis Brown and Russ Archibald and two Whites, Pat Moreno and Linda Tuttle. Linda Tuttle was selected. At no time was the race of the applicants discussed in the panel's deliberations.

The only quality factor levels I can recall were the ones on facility of using computers and one on facility of communications.

As best as I can recall Persis Brown and Linda Tuttle were rated the highest. The third ranked would have been Pat Moreno, followed by Russ Archibald. I believed Linda Tuttle was on top. I, myself, was advocating Persis Brown of my staff. Both Linda Tuttle and Persis Brown had worked directly for me and I was familiar with their abilities. Following the panel's meeting, Mr. Buzza offered advise to Ms. Marcella Brown and she in turn offered advise to Headquarters. I do not know what Mr. Buzza told Ms. Brown and I do not know what Ms. Brown told Headquarters. It should be noted that Persis Brown has since been promoted to the same grade 13 Public Trust Specialist. Carl Harris, and African-American employee, who had also worked directly for me, but who is out-stationed to the Hartford office, has also promoted to the that position. These promotion selections would have been made in Headquarters following recommendations of Bob Buzza and Ms. Brown. The three selected, Linda Tuttle, Persis Brown and Carl Harris, I believe were the best qualified to be promoted to the position of Public Trust Specialist..

Page 2 of 3 pages                                                    Initials ____

Exhibit  11
Page  2  of  3

They got their promotions on the basis of their abilities, not on the basis of their race.

I have read the above statement consisting of three pages and I declare under penalty of perjury that it is true and correct to the best of my recollection and belief.  I have initialed each page and signed the statement below.

Executed on this _____ day of _____ 2000 _____ .

            (day)                   (month)    (Signature of person

                                                     giving statement)

_____

(Signature of person witnessing above statement_

_____

(Printed or typed name)

Page 3 of 3 pages                                       Initials _____

Exhibit  ||
Page  3  of  3

# EXHIBIT 7

Linda M. Tuttle
4.

HUD MASO

1999 AUG 13 P 1: 52

HUMAN RESOURCES DIVISION

HAND DELIVERED TO BOSTON OFFICE

August 13, 1999

U.S Department of Housing and Urban Development
451 7th Street, SW
Room 2258
ATTN: 00-PTO-1999-0101AZ
Washington, D.C. 20410

Dear PTO Merit Staffing Team:

Enclosed is my application for the position of Public Trust Specialist, announcement number: 00-PTO-1999-0101AZ, in the Boston, Massachusetts Office. I have utilized the OF 612 format available on the Internet, and have included a narrative statement for each of the four quality ranking factors, and a copy of my most recent Performance Appraisal. Thank you for your attention to this matter.

Sincerely,

Linda M. Tuttle

Exhibit 17
Page 1 of 23

OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT
(OF 612 -- Form Approved: OMB No. 3206-021)

You may apply for most jobs with a resume, this form, or other written format. If your resume or application does not provide all the information requested on this form and in the job vacancy announcement, you may lose consideration for a job.

1. JOB TITLE IN ANNOUNCEMENT: **Public Trust Specialist**

2. GRADE(S) APPLYING FOR: **GS-13**

3. ANNOUNCEMENT NUMBER: **00-PTO-1999-0101AZ, Boston, MA**

4. LAST NAME:   FIRST, MIDDLE:

 **Tuttle,**    **Linda Marie**

5. SOCIAL SECURITY NUMBER: 

6. MAILING ADDRESS:

 **48 Buick Street**
 **Watertown, Massachusetts 02472**

7. PHONE NUMBERS (include area code)

 DAYTIME:

 EVENING: (

8. WORK EXPERIENCE: Describe your paid and non-paid work experience related to the job for which you are applying. (Do not attach job descriptions)

1) JOB TITLE: **Equal Opportunity Specialist/Civil Rights Analyst, GS-360-12**

 FROM: **10/97**  TO: **Present**

 SALARY:     HOURS PER WEEK: **40**

EMPLOYER'S NAME: **U.S. Department of Housing and Urban Development,**
**Office of Fair Housing and Equal Opportunity**

AND ADDRESS: **10 Causeway Street, Boston, MA 02222**

SUPERVISOR'S NAME: **Timothy M. Robison**

AND PHONE: **(617) 565-5305**

DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:

As a part of Management Reform I was re-assigned to the newly created Intake/Assessment Branch in the Boston Fair Housing Hub. Generally, I am responsible for the administration of the Department's civil rights-related program requirements, in connection with Title VIII of the Civil Rights Act of 1968, as amended, Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act of 1974, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Age Discrimination Act, and other relevant Executive Orders and regulations. In this role I am responsible for working with members of the public, advocates, attorneys and state/local agencies in drafting and filing discrimination complaints. This involves conducting an initial intake interview, making an assessment as to jurisdiction and whether the elements of the prima facie case have been met, and if so, drafting and filing the complaint. I will also conduct research on novel issues of law, as needed to determine HUD's jurisdiction over a particular matter, and assist other HUD staff in making referrals to our office. I was selected to participate on a team created to reduce the then current backlog of claims filed with the office. The team successfully reviewed over 300 claims, and made determinations as to what action should be taken on each claim. Each member of the team was given an "On the Spot" award for their successful participation in this endeavor. I have worked with a state agency on obtaining a Temporary Restraining Order (TRO) on a housing discrimination complaint which originated in our office. I have also been re-assigned as needed to conduct investigations, as was the case recently during the systemic investigation of the Boston Housing Authority. I participated as a member of a team of investigators selected to conduct a high profile, fast track investigation of complaints filed against the Boston Housing Authority.

In addition to the daily Intake work, I have also identified cases appropriate for conciliation at the Intake stage and have volunteered to work with the parties on conciliating the case. I have also been selected to serve as the Government Technical Monitor (GTM) for the State of Vermont Human Rights Commission, which recently received a HUD grant for capacity building under the Fair Housing Assistance Program (FHAP). Vermont's law has been deemed "substantially equivalent" and therefore they may now investigate cases under both state and federal (Title VIII) law. I have been working closely with the agency, providing technical assistance and monitoring its progress in expanding its fair housing enforcement program.

Exhibit __17__

Page __3__ of __23__

2) JOB TITLE: **Equal Opportunity Specialist, GS-360-9/11/12**

   FROM: **06/95**          TO: **10/97**

   SALARY: ⸱          ⸱ug) **per year**          HOURS PER WEEK: **40**

   EMPLOYER'S NAME: **U. S. Department of Housing and Urban Development**
   **Office of Fair Housing and Equal Opportunity**
   AND ADDRESS: **10 Causeway Street, Boston, MA 02222**

   SUPERVISOR'S NAME: **Merryl Gibbs**

   AND PHONE: **(617) 565-5319**

   DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:

   As a staff member of the Program Operations Division in FHEO, generally I was responsible for the administration of the Department's civil rights-related program requirements, in connection with Title VIII of the Civil Rights Act of 1968, as amended, Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act of 1974, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Age Discrimination Act, and other relevant Executive Orders and regulations. Specifically, I was responsible for reviewing fair housing program plans for consistency with program objectives, and monitoring all of the programs of the Public Housing, Housing and CPD Divisions of the Department relative to fair housing and equal opportunity. I would identify problem areas, make recommendations for corrective action, and provide technical assistance as needed. On-site monitoring was conducted, as well as providing information and education on fair housing and equal opportunity requirements. In this role I worked with HUD staff, the general public, advocates, attorneys, housing developers, HUD fund applicants/recipients and state/local government entities to provide technical assistance on the Department's civil rights-related program requirements.

   In addition to the daily program operations work, I was also responsible for working on a number of special assignments. These included drafting the first in the nation waiver to allow elderly public housing tenants in Boston to choose to be placed on development-specific vs. city-wide waiting lists. Drafting a waiver and supplemental documentation to allow for a former "West End" resident preference for a certain percentage of the Section 8 units in the Lowell Square development. Developing a model for review of designated housing allocation plans. Reviewed and rated Section 202 and 811 applications on tight deadlines. Assisted in the Section 3 Technical Assistance Team initiative. Advised and provided technical assistance to communities on the "Analysis of Impediments to Fair Housing Choice." Overseeing Boston's implementation of the Regional Opportunity Counseling (ROC) Program. Serving as Acting Director in Director's absence.

Exhibit **17**

Page **4** of **28**



3) JOB TITLE: **Special Assistant**

FROM: **09/85**      TO: **06/95**

SALARY: _____ per year      HOURS PER WEEK: **35 (full-time)**

EMPLOYER'S NAME: **Boston Redevelopment Authority**

AND ADDRESS: **One City Hall Square, Boston, MA 02201**

SUPERVISOR'S NAME: **Bernice McLennan**

AND PHONE: **(617) 722 - 4300**

DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:

In my tenure with the Boston Redevelopment Authority I held a number of positions and received a number of performance based promotions. When I began working there I worked in the Director's Office, preparing the daily briefing package and following up with staff on assignments made by the Director. I also prepared memorandum for the Board of Director's Meetings. I was subsequently promoted to the position of Special Assistant in the Human Resources Division, where I was to work on the reorganization of that division. In a collaborative environment we were able to transform the division from one which kept track of employee's attendance and leave, to a full service operation, which provided prompt responses to employee inquiries, within a 24 hour turnaround time. Being adept with computers, I also "troubleshooted" computer problems encountered by my colleagues. I managed the summer internship, workers' compensation and employee education programs and budgets. Upon completion of law school my role changed again, and I researched, wrote memorandum and counseled staff on federal and state employment laws. I developed policies and procedures in compliance with state and federal law, and drafted employment agreements, contracts and releases, and negotiated settlement of grievances. I also served as the Grievance Officer and Section 504 Coordinator, and conducted training on affirmative action and equal opportunity requirements.

9. MAY WE CONTACT YOUR CURRENT SUPERVISOR?  YES [X]

EDUCATION

10. MARK HIGHEST LEVEL COMPLETED: Some HS [], HS/GED [ ], Associate [ ], Bachelor [ ], Master [ ], Doctoral [X]



11. LAST HIGH SCHOOL or GED SCHOOL:  **Saint Columbkille High School**
                                      **Boston, Massachusetts 02135**

   YEAR DIPLOMA or GED RECEIVED:  **Diploma received:  1981.**

12. COLLEGES AND UNIVERSITIES ATTENDED (Do not attach a copy of your
    transcript unless requested.)

   1)  NAME:  **University of Vermont**
              **Burlington, Vermont 05405**

   SEMESTER CREDITS EARNED:  **121**      MAJOR(S):  **Economics and**
                                                     **Political Science**

   DEGREE (If any):  **Bachelor of Arts**      YEAR RECEIVED:  **1985**

   2)  NAME:  **Suffolk University Law School**
              **Boston, Massachusetts 02114**

   SEMESTER CREDITS EARNED:  **84**      MAJOR(S):  **Law**

   DEGREE (If any):  **Juris Doctor**      YEAR RECEIVED:  **1993**

OTHER QUALIFICATIONS

   13. Job-related training courses (give title and year).  Job-related skills (other
languages, computer software/hardware, tools, machinery, etc.).  Job-related certificates
and licenses (current only).  Job-related honors, awards, and special accomplishments
(publications, memberships in professional/honor societies, leadership activities, public
speaking, and performance awards).  Give dates, but do not send documents unless
requested.

**U.S. Department of Housing and Urban Development, Outstanding Performance
Awards:  1997, 1998, 1999; On the Spot Award, 1998.**

I have attended the following training programs during my tenure with HUD:

**Basic Compliance/Fair Housing Accessibility Guidelines, 1996**
**Advanced Fair Housing Investigative Techniques, 1996**
**Recent Developments in Fair Housing Enforcement, 1996**
**"Visitability", 1996**
**CPD Mapping Software, 1996**
**Entrepreneurship Certificate Program, Howard University Small Business** __

Development Center, 1996
Non-Discrimination in Public Housing Occupancy, 1997
Regional Opportunity Counseling Program, 1997
Freedom of Information Act, 1997
Opening Doors, New Initiatives in Fair Housing, 1997
National Fair Housing Testing Conference, 1998
HUD Regional Training for Investigators, 1998
Negotiate to Win, 1998
HUD's Title Eight Automated Paperless Office Tracking System (TEAPOTS), 1998
Boston HUD/FHEO Forum on Hate Crimes, 1998
Homeownership Opportunities for Persons with Disabilities, 1999
FHAP/FHIP Training, 1999

I have also had extensive and ongoing computer training in the following software/applications/systems:

Word, Excel, Windows, Lotus 1-2-3, Word Perfect, Dbase III, Lotus Notes, HUD TEAPOTS, Apple MacIntosh software and applications, WESTLAW, Lexus, and conducting research on the Internet - including relevant fair housing regulations and case law.

I am currently admitted to practice law in and a member in good standing of the Bar in the following jurisdictions:

Commonwealth of Massachusetts, Admitted:  December 15, 1995.
United States Court of Appeals, First Circuit, Admitted:  November 9, 1995.
United States District Court, District of Massachusetts, Admitted:  December 15, 1995.

I am a member of/volunteer for the following committees/organizations:

Massachusetts Bar Association, Alternative Dispute Resolution Committee, 1996 - Present.
Women's Bar Association, Family Law Project for Battered Women, Volunteer Attorney, 1996 - Present.

---

GENERAL:

14.  ARE YOU A U.S. CITIZEN? ........................ YES [ X ]  NO [ ]

15.  DO YOU CLAIM VETERANS' PREFERENCE? ............. YES [ ]  NO [ X ]

   If YES, mark your claim of 5 or 10 points below:

Exhibit  17
Page  7  of  23

5 POINTS [ ] -- Attach your DD 214 or other proof.

10 POINTS [ ] -- Attach an Application for 10-Point Veterans'
Preference (SF 15) and proof required.

16. WERE YOU EVER A FEDERAL CIVILIAN EMPLOYEE? ...YES [ X ]  NO [ ]

If YES, for Highest Civilian Grade give:

SERIES: 360    GRADE: 12    FROM: 06/97    TO : **Present**

17. ARE YOU ELIGIBLE FOR REINSTATEMENT BASED ON
CAREER OR CAREER-CONDITIONAL FEDERAL STATUS? **Not applicable.**

APPLICANT CERTIFICATION

18. I certify that, to the best of my knowledge and belief, all of the information on and
attached to this application is true, correct, complete and made in good faith. I
understand that false or fraudulent information on or attached to this application may be
grounds for not hiring me or for firing me after I begin work, and may be punishable by
fine or imprisonment. I understand that any information I give may be investigated.

SIGNATURE: _Linda M. Tuttle_    DATE SIGNED: August 12, 1999

**1.  Ability to analyze and solve problems related to the technical interpretation and application of Title VIII of the Civil Rights Act of 1968, Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act of 1968, Section 3 of the Housing and Urban Development Act of 1968, Section 504 of the Rehabilitation Act of 1973, Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act, and the Fair Housing Act, policies, procedures and standards.**

My law school education, HUD training and on the job experience in HUD's Office of Fair Housing and Equal Opportunity (FHEO) have provided me with the skills and experience necessary to analyze and solve problems related to the application and interpretation of the civil rights laws over which FHEO has jurisdiction, as delineated above.  I have received training in HUD's civil rights related program requirements, the civil rights laws noted above, as well as investigative skills training.  My law school education consisted of courses which covered anti-discrimination laws, constitutional law, legal research and writing, and civil rights statutes.  I am a member in good standing of the Bar in the Commonwealth of Massachusetts.  Being an attorney by profession, my education and experience have been focused on interpreting laws, analyzing case law and regulations, and applying the facts of a particular situation to the law to make a determination as to the appropriate legal outcome

I have had many opportunities to apply these skills in my work in FHEO.  In the Intake/Assessment Branch I am responsible for drafting housing discrimination complaints capable of withstanding legal challenge.  Jurisdictional elements must be analyzed in accordance with the requirements of Title VIII, Title VI, Section 109, Section 3, Section 504, the ADA and the Age Discrimination Act and accompanying regulations, prior to complaint filing.  In the process of perfecting a complaint, novel issues of law may arise relating to jurisdiction which must be researched and analyzed in order to make a jurisdictional assessment.  I also provide technical assistance on the interpretation and application of these laws and regulations to HUD staff, and HUD "customers".  I served as a member of the Section 3 Technical Assistance Team Initiative in Boston where I gained extensive knowledge about the Section 3 requirements.  I was also assigned to conduct the initial intake on Section 3 complaints prior to this task being transferred to Headquarters.

In the Program Operations and Enforcement Branches I was given assignments which required me to review documents and evidence in light of the requirements of the civil rights statutes and regulations and make a determination as to the appropriate outcome.  One example my abilities in this area is my being responsible for drafting the first in the nation waiver which allowed applicants for elderly public housing developments in Boston to choose the development in which they wanted to live, as opposed to being placed on a city-wide waiting list.  This required doing extensive research and analysis of HUD's regulations to develop this waiver, which had never before been granted by HUD to a public housing authority anywhere in the nation.

Exhibit 17
Page 9 of 23

## 2.  Extensive knowledge of the programs and initiatives of the Office of Fair Housing and Equal Opportunity.

I have extensive knowledge of and experience with the programs and initiatives of HUD's Office of Fair Housing and Equal Opportunity (FHEO), based on my experience as a member of the FHEO staff.  During my tenure with FHEO as an Equal Opportunity Specialist/Civil Rights Analyst, I have had the opportunity to work in the Program Operations, Intake/Assessment and Enforcement Branches.  This experience of working in the three branches has provided me with a broad knowledge of FHEO programs and initiatives.  As a member of the Program Operations Branch, I was responsible for reviewing fair housing program plans for consistency with program objectives, and monitoring all of the programs of the Public Housing, Housing and CPD Divisions of the Department relative to fair housing and equal opportunity.  I would identify problem areas, make recommendations for corrective action, and provide technical assistance as needed.  On-site monitoring was conducted, as well as providing information and education on fair housing and equal opportunity requirements.  In this role I worked with HUD staff, the general public, advocates, attorneys, housing developers, HUD fund applicants/recipients and state/local government entities to provide technical assistance on the Department's civil rights-related program requirements.  This required me to be knowledgeable about the Department's programs and initiatives and be able to communicate this information to HUD "customers".  I have also had personal experience serving on the Section 3 Technical Assistance Team Initiative in Boston and working extensively with the City of Boston on its Regional Opportunity Counseling (ROC) and Vacancy Consolidation Counseling (VCCP) programs.

In my work in the Intake/Assessment Branch I have daily telephone contact with the general public, attorneys, advocates, and housing providers who need information about general fair housing principles, as well as information on HUD's programs and activities.  To assist me in this work I keep myself updated on new programs and initiatives by reading notices and other relevant materials available on the HUD web, and keeping track of regulatory changes in the Federal Register.  I also attend satellite broadcasts and other relevant training on new FHEO programs and initiatives. My work in all three branches of FHEO has enabled me to work with HUD staff in other program areas, to provide them with information about FHEO programs, activities and requirements.  These relationships help to keep me apprised of ongoing activities and initiatives in other HUD program areas, so that I may ensure that any potential fair housing issues are considered.



**1. Skill in fact-finding analysis, formulating and presenting recommendations and negotiating resolutions of complex issues.**

My law school education combined with my experience and training at HUD in the Program Operations, Enforcement and Intake/Assessment Branches of the Office of Fair Housing and Equal Opportunity has required me to utilize and enhance my skills in fact finding analysis, negotiation and resolution of complex matters. One example of this is I was selected to work on a special team to investigate complaints filed against the Boston Housing Authority. In this capacity as a member of this special team, I conducted an extensive investigation into the allegations of discrimination. This high profile assignment, which was on a fast track, required in-depth interviews with Boston Police, Housing Authority staff, witnesses and complainants. Documentary evidence, such as the Housing Authority's operating policies and procedures, as well as complainant's documentation had to be reviewed and analyzed to determine whether a prima facie case of discrimination had been proven. This assignment required me to analyze a complex set of facts, prepare a Final Analysis and Investigative Report on the investigation, and undertake conciliation efforts with the parties. I was required to utilize and enhance all of my existing skills in these areas, due to the high profile nature of the assignment and need for a prompt investigation.

Another example of my knowledge, skills and abilities in this Quality Ranking Factor is in my work in the Intake/Assessment Branch of the Office of Fair Housing and Equal Opportunity. I am called upon daily to make assessments as to whether a particular individual's issues fall within HUD's jurisdiction for the purposes of filing a discrimination complaint. I must assess the factual information presented, analyze it in light of our jurisdictional requirements, and make a determination as to whether a complaint should be filed. I also make determinations as to whether the negotiation of a settlement of a particular filed complaint may be done at the Intake stage, prior to investigation. I then work with the parties to facilitate conciliation at this stage. Because of the analysis and legal research I have done in preparation for conciliation, I have been successful in negotiating resolutions on which all parties will agree.

In my work in the Program Operations Branch I was routinely given assignments of a complex and sensitive nature for review and recommendation of a creative solution for the problems presented. One example is that I was responsible for researching and developing a first in the nation waiver of HUD regulations to allow for elderly public housing residents in Boston to choose the development in which they wanted to reside, as opposed to being placed on a city-wide waiting list. I also was responsible for researching and developing a waiver to allow former residents of the West End neighborhood in Boston to be given a preference for a certain percentage of the Section 8 units. This was a high profile and highly contested issue in Boston which required a resolution which struck the appropriate balance between HUD's obligation to ensure that housing is affirmatively marketed to those least likely to apply and these formerly displaced residents of the "West End" neighborhood of Boston.

Exhibit _17_
Page _11_ of _23_

**2. Ability to gather, assemble and analyze facts, draw conclusions and devise solutions to assigned problems.**

My education, both undergraduate as well as law school has provided me with the requisite ability to gather, assemble and analyze facts, draw conclusions and devise solutions to assigned problems.  I have also received HUD training on these skills, including Introductory and Advanced Investigative Techniques training.  This training and education, both formal and on-the-job has enabled me to be adept at gathering information through interviews, legal research and document review and analyzing it in accordance with the applicable law and regulations.  I then devise my own solutions to address any problem areas.  One example of this would be my review of the Designated Housing Allocation plans for New England.  While a member of the Office of Fair Housing and Equal Opportunity's Program Operations Branch, a new law was passed allowing housing authorities to designate certain developments as "elderly only".  In order to designate developments as elderly only, the housing authority had to obtain HUD approval of the plan.  As this was a new law, there was no procedure, regulation, or policy in place for reviewing such plans.  I was assigned the task of reviewing the plans submitted for New England and developing a way to review and analyze them in accordance with the law.  My review of these plans included obtaining additional information about the local community and its housing resources.  I was able to develop a workable format for reviewing the plans, which was cited for use as a national model for the review of the designated housing allocation plans.

Throughout my career at HUD I have received Outstanding performance ratings for the element in which this quality ranking factor is included as part of the rating criteria.  This was based on various assignments which I have undertaken which required me to research issues which impacted upon HUD's civil rights related program requirements, and devise solutions to any possible areas of conflict.  This included negotiating a resolution to a conflict between the rights of displaced residents of the former West End neighborhood of Boston and other applicants for affordable housing in Boston by drafting a waiver to allow a preference for the former West End residents for a certain percentage of the Section 8 units.  I also drafted a first in the nation waiver allowing applicants for elderly public housing developments in Boston to choose to be placed on waiting lists for specific developments as opposed to the city-wide waiting list, in accordance with HUD regulations.  Both of these situations were high profile and highly publicized in the local press and a creative solution was necessary to ensure all rights were protected.  As the situations were unique, extensive research was necessary to devise an appropriate resolution of the issues raised, while ensuring HUD's regulatory requirements were met.

In my daily work in the Intake/Assessment Branch I am often assigned cases of a complex nature in which the parties have submitted large quantities of information for review.  I must expeditiously review the materials as well as any relevant statutes, regulations and case law and make a determination as to HUD's jurisdiction.  I must also assess whether the situation is one which calls for prompt judicial action, such as obtaining a temporary restraining order (TRO) and act accordingly.

Linda M. Tuttle, Quality Ranking Factors
00-PTO-1999-0101AZ, Boston, Massachusetts                    2

Exhibit  17
Page 18 of 23



3. **Ability to communicate clearly, concisely and informatively both orally and in writing.**

   I have strong communication skills as evidenced by my receipt of "Outstanding" performance ratings in this element, for each year of my entire HUD career. My education, both undergraduate and law school, required me to develop and enhance both my written and verbal communication skills, through the submission of papers and briefs and participation in oral advocacy classes. In my present role in the Intake/Assessment Branch in HUD's Office of Fair Housing and Equal Opportunity, I conduct interviews and provide technical assistance over the telephone, daily. I need to communicate complex legal issues in a format that is easy to understand. I am often called upon to work with individuals grappling with difficult and emotional issues of discrimination, to assist them in providing the necessary information in order to perfect a complaint. After conducting a successful interview I must then synthesize this information into a viable complaint within HUD's jurisdiction and which meets the elements for a prima facie case.

   In addition to drafting clear and concise complaints capable of withstanding legal challenge, my writing skills are further evidenced by having drafted the first in the nation waiver allowing elderly public housing applicants in Boston to choose to be placed on up to three development-specific waiting lists, as opposed to a city wide waiting list. This made it possible for elders to remain living in the neighborhoods that they had spent most of their lives in, close to family, friends and needed services, as opposed to having to relocate to a neighborhood potentially far away from where they had always resided. I also drafted a waiver and supplemental documentation which allowed for a former "West End" resident preference for a certain percentage of the Section 8 units at the Lowell Square development in Boston. The West End was a neighborhood raised by urban renewal in the 1950's, and the Lowell Square development was the final parcel of land available for development as affordable housing in the former West End neighborhood. The former "West Enders" wanted priority for housing based on their status as having been displaced by urban renewal. This high profile and unique situation required a creative solution which would provide some redress to the former West Enders, while also complying with HUD's regulations to affirmatively market housing to those least likely to apply. To further complicate matters, a consent decree which Boston was currently operating under also needed to be factored into the resolution. This waiver provided a creative solution to achieve a balance between the West Enders and other applicants for affordable housing in Boston.

   Further evidence of my written communication skills is evidenced by my having developed a model for the review of designated housing allocation plans which was recommended for national use. I have also had the opportunity to represent HUD formally at the Section 202 and 811 information sessions held annually, by making presentations on the application and rating process. I have represented HUD at meetings with local housing authorities and community groups, and served on the Section 3 Technical Assistance Team Initiative in Boston.

**4. Skill in using personal computers and data base systems.**

I have an extensive background in using personal computers and data base systems. I have received ongoing training on all of the HUD systems currently in use, including Word, Excel, Windows, and Lotus Notes. I have also received training in the legal databases - WESTLAW and LEXUS, Apple MacIntosh computers and software, and am adept at using the Internet to search for relevant materials, including reported case law, statutes and regulations. I also researched Internet sites to facilitate the work of the Intake/Assessment Branch by locating local Assessor's Offices on-line for the purposes of conducting property searches, and phone directories, including reverse directories, for the purposes of locating proper parties to a complaint. I provided Internet "Shortcuts" to staff of the Intake Assessment Branch so they could easily access these resources.

In terms of other HUD computer systems, the Title Eight Automated Paperless Office Tracking System (TEAPOTS) is currently in use for all claim and complaint processing. I have received training on this system, and volunteered to be a "tester" on the latest Internet version of TEAPOTS. I use this system daily and have been using the various versions of it for almost two years. I am adept at using it to complete my work in a timely fashion, and provide assistance to my colleagues in "troubleshooting" problems they may encounter while using the system. I also am able to conduct research through the HUD web on HUD handbooks, regulations and relevant statutes. My extensive knowledge of computers and skills in using them has enabled me to be comfortable working with computers and mastering new software programs and applications as they are developed.

# Performance Appraisal

U.S. Department of Housing
and Urban Development



| Employee Name | Social Security Number | Organization Segment | Organization Code |
|---|---|---|---|
| LINDA TUTTLE | ▓▓▓▓▓ | Intake Assessment Branch | 83-01-01-0500-08-09-00-00 |

| Position Title | Series and Grade | Dates of Appraisal Period | Date Rating Made |
|---|---|---|---|
| Equal Opportunity Specialist Civil Rights Analyst | 360-12 | From 02/01/98 To 01/31/99 | 2/23/99 |

☐ GM (Performance Management and Recognition System)  ☒ GS (General Schedule)  ☐ WG (Wage Grade)  ☐ GS -AFGE  ☐ WG -AFGE

Rating Official (Signature & Date)  2/19/99

Employee (Signature & Date)  Linda Tuttle 2/23/99

Reviewing Official (Signature & Date)  Marcella Brown 3/1/99

Note: Employee signature indicates only that the rating has been discussed with the employee and does not signify agreement or disagreement with the rating.

Progress Review: Employee's initials indicate only that the progress review meeting was held. They do not indicate agreement or disagreement with the results.

Element Ratings

| Critical Element No. | Outstanding | Highly Successful | Fully Successful | Marginally Successful | Unacceptable |
|---|---|---|---|---|---|
| 1 | X | | | | |
| 2 | X | | | | |
| 3 | X | | | | |
| 4 | X | | | | |

| Review Dates | Supervisor's Initials | Employee's Initials |
|---|---|---|
| | | |

Summary Ratings

☒ Outstanding  ☐ Highly Successful  ☐ Fully Successful  ☐ Marginally Successful  ☐ Unacceptable

☐ Employee is Unratable (PMRS Only). State Reason:

Sensitive Information: The information collected on this form is considered sensitive and is protected by the Privacy Act. The Privacy Act requires that these records be maintained with appropriate administrative, technical, and physical safeguards to ensure their security and confidentiality. In addition, these records should be protected against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom the information is maintained.

**Elements & Standards**

U.S. Department of Housing
and Urban Development

| Assigned | Review Official's Initials | Supervisor Initials | Employee Initials | Rating Date | Rating | Element Number |
|---|---|---|---|---|---|---|
| 98 | | | LT | 2/25/99 | O | 1 |

Element Description

WORKLOAD MANAGEMENT

Employee's initials indicate only that critical elements and performance standards were communicated to him/her.
They do not signify agreement or disagreement.

Outstanding
1) Takes the initiative to plan work assignments and to identify additional work items for consideration by the supervisor. The supervisor seldom has to provide guidance or be involved to maintain a high output of useful work or to complete assignments on time.

2) Exhibits flexibility in adjusting workload to handle highest priority assignments by breaking tasks into subtasks and pursuing subtasks simultaneously to expedite completion with little or no guidance from the supervisor. Applies creative solutions to problems and demonstrates exceptional personal commitment to the accomplishment of urgent assignments within the required deadlines.

3) Organizes work assignments in a superior manner and completes many assignments ahead on schedule. Consistently produces a high volume of excellent quality work products. Assists other staff with their assignments to prevent slippage.

4) Utilizes time very effectively and completes assignments rapidly without sacrificing quality. When priorities change, the employee immediately adapts without complaint and performs according to the new priorities.

Fully Successful
1) Performs assigned work independently under established guidelines. Develops and recommends solutions to problems that may arise and obtains supervisory guidance on complex policy and program issues.

2) Recognizes the relative urgency of work items and works with supervisor to adjust workload when higher priority assignments are received. Demonstrates personal commitment accomplishment of assigned work.

3) Organizes assignments and manages time effectively. Generally completes assignments within established deadlines. Follows up on work and advises supervisor of potential problems which are within the employee's direct control or knowledge so that appropriate action can be taken. Understands scope and content of work and obtains supervisory clarifications to avoid unnecessary work.

Unacceptable
1) Does not perform assigned work independently. Avoids or sometimes ignores supervisory guidance. Fails to provide solutions to problems.

2) Fails to recognize urgency of work items and allows unexplained slippage in meeting deadlines.

3) Fails to manage time effectively or to organize assignments. Assignments are frequently late. Fails to follow up slippages that are within the employee's control. Misunderstands scope of work assigned and does not seek supervisor's clarification.

Accomplishments

See attached

Exhibit 17
Page 16 of 23

Previous editions are obsolete

form HUD-8054.2 (10/90)
HUD PMRS Plan & PMS Plan



**Work Load Management**

In addition to her normal assignments Ms. Tuttle has been assigned as the Government Technical Monitor for the Vermont Human Rights Commission.   This is a new FHAP agency which requires substantial technical assistance on all phases of it's new relationship with the Department.  She actively sought out new and additional assignments which directly led to the assignment of the function to the Branch. Her handling of the new and additional responsibility demonstrates her ability to plan work assignments and to identify additional work items that may be important to the Intake / Assessment Branch's responsibility.

Flexibility has been demonstrated allowing the highest priority items to be accomplished with minimal impact on timeliness, and little guidance from her supervisor.  Tuttle has produced a high volume of excellent quality  work, and has managed her case load independently.  This demonstrates effective use of time, and adaptability to changing priorities.

## ements & Standards

U.S. Department of Housing
and Urban Development

| Date Assigned | Review Official's Initials | Supervisor Initials | Employee Initials | Rating Date | Rating | Element Number 2 |
|---|---|---|---|---|---|---|
| 1/17/98 | | | LT | 2/23/99 | O | |

Element Description

DEPARTMENTAL/PROGRAM REPRESENTATION

Employee's initials indicate only that critical elements and performance standards were communicated to him/her.
They do not signify agreement or disagreement.

**Outstanding**
1) Displays exceptional tact, persuasiveness, and organization of subject matter in his/her presentation in meetings with Departmental officials, program clientele and concerned citizens. The employee's performance confers respect on him/herself as well as the Department/program office.

2) Creates a positive image of the Department/program office by constantly responding to oral, telephone and written inquiries in a courteous, prompt and efficient manner.

3) Negotiates imaginative and creative solutions to complex and unique problems consistent with applicable law and Departmental directives. Maintains courteous relations even when acceptable solution is readily forthcoming. Effectively follows up on the results of negotiations and consults with supervisor when renegotiations of the solutions would be appropriate.

**Fully Successful**
1) Represents Department/program office acceptably in meetings with Department or program clientele, public officials, and concerned citizens. By seeking knowledgable, understandable presentations of subject matter appropriate to each meeting, the employee gives a favorable impression of HUD or the program. 2) Responds to telephone calls and written inquiries in a courteous, prompt and coherent manner. When unable to respond immediately to an inquiry, the employee tactfully informs the questioner of anticipated days and takes responsibility to obtain a definitive answer within the time indicated. 3) Routinely informs his/her supervisor and Department/program staff of the status and results of representational activities. 4) Develops good working relationship with Departmental or program clientele as a result of representational activities. 5) Negotiates acceptable solutions consistent with Departmental directives or applicable law to resolve routine or typical situations or conflicts. Achieves positive results in intra-departmental meetings or negotiations and coordinates input from other concerned organizations. 6) Sustains confidentiality of information protected by the Privacy Act.

**Unacceptable**
1) Represents Department/program office unacceptably in all matters. Presentations are inaccurate, and/or incomprehensible or inappropriate to each meeting, giving an unfavorable impression of HUD or the program. 2) Responds to telephone calls and written inquiries in a discourteous or incoherent manner and delays when unable to respond immediately, and neglects responsibility to obtain a definitive answer. 3) Does not inform supervisor and Department/program staff of status and results of representational activities. 4) Impairs working relationship with Departmental or program clientele as a result of representational activities. 5) Fails to negotiate acceptable solutions consistent with Departmental directives or applicable law to resolve routine or typical situations or conflicts. Generates negative results in intra-departmental meetings or negotiations, and does not coordinate input from other concerned organizations. 6) Violates or impairs confidentiality of information protected by the Privacy Act.

Accomplishments

See attached

Exhibit 17
Page 18 of 23

Previous editions are obsolete

form HUD-8054.2 (10/98)
HUD PMRS Plan & PMS Plan



**Departmental / Program Representation**

Ms. Tuttle creates a positive image of the Department by responding to oral and written inquires, and possible complaints of housing discrimination, in a prompt courteous and efficient manner. Often called upon to work with particularly difficult complaints, she can be relied upon for tact and good judgment in the most highly charged and sensitive situations.    The quality of her representation was also demonstrated at the FORUM ON HATE CRIMES where she presented the discussion points developed by one of the small groups.

Exhibit 17
Page 19 of 23

_lements & Standards

U.S. Department of Housing
and Urban Development

| Date Assigned | Review Official's Initials | Supervisor Initials | Employee Initials | Rating Date | Rating | Element Number |
|---|---|---|---|---|---|---|
| 1/17/98 | | | LT | 2/23/99 | ◯ | 3 |

Element Description

PROGRAM/TECHNICAL KNOWLEDGE

---

Employee's initials indicate only that critical elements and performance standards were communicated to him/her.
They do not signify agreement or disagreement.

Outstanding
1) Demonstrates superior program/technical knowledge by producing work which is accurate and complete in relation to technical requirements of the program to which the employee is assigned. The employee's work also reflects consideration of the impact on related or complementary programs.

2) Consistently produces technically correct work within time constraints imposed by supervisor, reflecting the ability to find the appropriate guidance for each program in such references such as HUD regulations, Handbooks, etc. and requiring minimal supervisory relations related to technical content.

3) Correctly applies criteria established in relevant law or Departmental directives to unique, complex, or otherwise unusual conflicts or issues. Also, the employee has derived recommendations or other responses which creatively enhance the intended results.

Fully Successful
1) Demonstrates a working knowledge of the organization to which assigned by producing work which is accurate in relation to the technical requirements of the organization and which reflects individual research by the employee.

2) Provides recommendations for decisions or procedural revisions which sustain or enhance the intended results of the program.

3) Correctly applies criteria established by relevant law and directives to routine gram area issues, problems or conflicts.

4) Regularly familiarizes self with changes in policies, procedures, or laws having direct impact on assigned program area.

5) Demonstrates knowledge of Departmental organization and systems as they relate to development or modification of policies or procedures affecting assigned program areas.

Unacceptable
1) Does not demonstrate, despite training and job experience, working knowledge of the technical requirements of the program or office to which the employee is assigned. Work products are technically deficient and do not reflect adequate research.
2) Fails to provide reasonable recommendations for decisions on Departmental issues. Employee depends on others for assistance rather than performing his/her work independently.
3) Makes factual and analytical errors in applying relevant law and Departmental directives to routine assignments.
4) Does not maintain technical fluency by familiarizing self with changes in policies, procedures or laws affecting the program area or the office to which the employee is assigned.
5) Fails to demonstrate a knowledge of Departmental organizations and systems and how they relate to program or office policies.

---

Accomplishments

See attached

)

Exhibit 17

PAGE 30 23

form HUD-8054.2 (10/90)
HUD PMRS Plan & PMS Plan



**Program / Technical Knowledge**

Tuttle's work demonstrates superior technical knowledge, and unusual issues are researched and developed for supervisory review.  Worked with a FHAP agency to obtain  a temporary restraining order in the Judge Rotenberg Educational Center complaint, Worked with counsel to research novel legal issues in the Harbor Schools complaints. Ms. Tuttle has also demonstrated a substantial knowledge of other program areas and can be relied upon to find information when it is not readily available.  Regulations of these other areas have been researched to insure proper referrals to other program areas as in the processing of the Whalen and McDonald claims.

Exhibit _17_
Page _21_ of _23_

| ...ements & Standards | | | | U.S. Department of Housing and Urban Development | | |

| Date Assigned | Review Official's Initials | Supervisor Initials | Employee Initials | Rating Date | Rating | Element Number |
|---|---|---|---|---|---|---|
| 1/7/98 | | | | 2/23/99 | O | |

**Element Description**

WRITTEN/ORAL COMMUNICATION

---

Employee's initials indicate only that critical elements and performance standards were communicated to him/her. They do not signify agreement or disagreement.

**Outstanding**

1) Produces written work products and oral presentations which demonstrate a superior understanding of applicable rules and regulations and their impact on the program participants and/or the Department.

2) Creates written reports and other work products which are rarely returned for rewrite and in which the employee has displayed superior writing skills.

3) Completes written work products of exceptional quality despite sensitive or complex issues with only minimal guidance from the supervisor.

**Fully Successful**

1) Produces written products which clearly express ideas, provide accurate information and which are responsive to the needs of the organization.

2) Makes oral presentation on various subjects which coherently inform the listener and which are diplomatic and tactful in tone.

3) Edits or assists in organizing written material for publication or assists in [p]aring oral presentations. 4) Uses the appropriate style and tone for letters or [memo]randa prepared for signature by Departmental officials.

**Unacceptable**

1) Written products do not clearly express ideas, provide information and are unresponsive to the needs of the organization.

2) Oral presentations are incoherent, do not inform the listener, and are undiplomatic or tactless.

3) Uses inappropriate style and tone in letters or memoranda prepared for signature for Departmental officials

**Accomplishments**

See attached

Exhibit 17

Page 22 of 23

form HUD-8054.2 (10/90)
HUD PMRS Plan & PMS Plan

Work with claimants and the public has been of consistently high quality and has demonstrated a clear understanding of fair Hosing laws and regulation and an understanding of program areas outside Fair Housing and Equal Opportunity.

Ms. Tuttle has consistently produced high quality work products which are rarely returned for correction or rewrite. This is particularly true of the Fair Housing complaints, which are the major area of her responsibility.    The preparation of the written of complaints are consistently sound and of clarity. Her work demonstrates a high degree of understanding of program policy and regulation. Her work has included new and unfamiliar areas such as the FHAP program, and her representation of the Department through oral and written communication with the Vermont Human Rights Commission has been of the highest caliber.

Ms. Tuttle has handled a significant number of Congressional responses, which have demonstrated the exceptional quality of her written work.

Exhibit 17
Page 23 of 23

# EXHIBIT 8

JANUARY 8,2001

TO: RONALD McWOLD

FROM: RUSSELL J. ARCHIBALD

RE: REBUTTAL STATEMENT

THE FOLLOWING IS MY STATEMENT REBUTTING INFORMATION GIVEN TO YOU FROM STAFF PERSONS IN FHEO BOSTON AND THE ASSISTANT SECRETARY IN WASHINGTON.

1) REGARDING THE ASSERTIONS MADE BY ASST. SECRETARY PLAZA. I ADMIT MS PLAZA DOES NOT KNOW ME PERSONALLY, BUT SHE WAS THE PERSON WITH AUTHORITY TO APPOINT THE CANDIDATE TO THE PUBLIC TRUST OFFICER POSITION. THE IMPORTANT STATEMENT SHE DID MAKE WAS REFERENCE TO WHY THESE POSITIONS WERE CREATED. SHE STATED "THE POSITION WAS ESTABLISHED BY THE SECRETARY TO CREATE PROMOTIONAL AND LEADERSHIP OPPORTUNITIES FOR LONG STANDING HUD EMPLOYEES". THE POINT I MAKE IS I HAVE BEEN WITH THE BOSTON FHEO OFFICE FOR TWELVE YEARS AT GRADE 12. IF THE REASON FOR ESTABLISHING THESE POSITIONS WAS TO PROMOTE ADVANCEMENT OPPORTUNITIES FOR CAREER HUD EMPLOYEES HOW DOES SELECTING A PERSON WHO HAS ONLY BEEN AT FHEO FOR THREE YEARS OVER PERSONS WITH MORE THAN TEN YEARS EXPERIENCE. SECONDLY, THE UNION AGREEMENT WITH MANAGEMENT STATES " MANAGEMENT SHALL CONDUCT A CONTINUING CAMPAIGN TO ELIMINATE DISCRIMINATION AND/OR PREJUDICE FROM ITS PERSONNEL PRACTICES AND POLICIES..... PROGRAMS SHALL INCLUDE, BUT NOT BE LIMITED TO, IMPLEMENTATION OF THE FOLLOWING OBJECTIVES AND GOALS: OVERCOMING MANIFEST IMBALANCES AND CONSPICUOUS ABSENCES OF MINORITY GROUPS AND WOMEN IN GRADE LEVELS....." THE POINT I MAKE IS 80% OF THE BOSTON FHEO STAFF ARE FEMALE AND THE THREE NON-SUPERVISORY STAFF MEMBERS AT GRADE 13 0R ABOVE ARE WHITE WITH LESS TIME AND EXPERIENCE THAN I HAVE.

2) REGARDING ASSERTIONS MADE BY MR. BUZZA. TO BEGIN MR BUZZA STATED HE CALLED A PANEL TOGETHER TO REVIEW THE APPLICANTS FOR THE PTO POSITION. HE FAILED TO POINT OUT THAT THE RACIAL COMPOSITION OF THE PANEL WAS ALL WHITE EXCEPT FOR MR. CRAIG MY IMMEDIATE SUPERVISOR. HE ALSO FAILED TO STATE THAT IN MY TWELVE PLUS YEARS AT FHEO I NEVER WORKED UNDER MERRYL GIBBS OR TIM ROBISON SO HOW COULD THEY SPEAK ON MY WORK OR ACCOMPLISHMENTS. MR. CRAIG KNOWS MY ABILITIES AND THE LEAD I HAVE TAKEN OVER THE MORE DIFFICULT CASES FILED WITH THE BOSTON OFFICE. SECONDLY, I REQUEST THAT YOU TO PLEASE CONTACT ANY FHEO OFFICE IN THROUGHOUT THE COUNTRY AND I'M SURE THEY WILL EXPLAIN THE STRUCTURE OF THE OFFICE. FEDERAL HOUSING DISCRIMINATION COMPLAINTS ARE FILED WITH OUR OFFICE. ONCE THE COMPLAINT IS RECEIVED BY MAIL OR TELEPHONE THE E.O. SPECIALIST IN THE INTAKE DIVISION INPUTS THE INFORMATION INTO A COMPUTER SYSTEM.( THIS IS THE DIVISION LINDA TUTTLE WORKED IN) WHEN ALL THE INFORMATION IS RECEIVED AND THE COMPLAINT IS PERFECTED IT IS TRANSFERED TO TIM ROBISON CHIEF OF THE INTAKE DIVISION FOR REVIEW. MR ROBISON EITHER REFERS IT TO A STATE AGENCY OR TRANSFERS THE CASE TO MR CRAIG, CHIEF OF THE INVESTIGATION DIVISION. MR. CRAIG REVIEWS THE COMPLAINT AND ASSIGNS THE CASE TO ONE OF FIVE INVESTIGATORS IN THE INVESTIGATION BRANCH. THE INVESTIGATOR MEETS WITH THE PARTIES TO THE ACTION; INTERVIEWS WITNESSES; COLLECTS EVIDENCE; AND FORMS THE LEGAL THEORIES UPON WHICH THE CASE WILL EITHER BE PRESENTED FOR TRIAL OR CONCILIATED. INVESTIGATORS HANDLE CONCILIATION OF THEIR CASES. THE THIRD DIVISION OF ALL FHEO OFFICE'S ARE E.O.

Exhibit 7
Page 1 of 3   RJH

Case 1:04-cv-10503-MEL    Document 28-2    Filed 08/17/2007    Page 55 of 65

SPECIALISTS WHO MONITOR THE CASES WE TRANSFER TO STATE AGENCIES. THEY ARE ALSO THE CONTACT PERSON AT HUD FOR ALL REFERALS.

THE REASON I DISCUSSED THE DIVISONS OF ALL FHEO OFFICES IS TO POINT OUT HOW THE MAIN AREA OF ALL OFFICES ARE THE INVESTIGATION OF CASES. I RECOMMEND YOU CONTACT MR. CRAIG OR THE PREVIOUS HUB DIRECTOR ROBERT LAPLANTE TO EXPLAIN THE IMPORTANCE OF THE DIVISONS WITHIH THE OFFICE.

3) REGARDING THE STATEMENT BY MR BUZZA THAT UP AND ABOVE THE QUALITY RANKING FACTORS ESTABLISHED BY WASHINGTON HE DECIDED TO CREATE TWO(2) ADDITIONAL "LOCAL FACTORS" REFLECTING THE NEEDS OF THE BOSTON OFFICE. I AM OF THE OPINION THESE WERE CREATED AS A PRETEXT TO ELIMINATE ME AS A PRIME CANDIDATE FOR THE PTO POSITION. THE FIRST, DEMONSTRATED ABILITY OR POTENTIAL FOR VERSATILITY, INCLUDING THE ABILITY TO PARTICIPATE IN AND LEAD TEAM INVESTIGATIONS, AND THE ABILITY TO REACT PRODUCTIVELY TO UNEXPECTED ASSIGNMENTS OR CHANGES IN ROUTINE, ESPECIALLY ASSIGNMENTS FOR WHICH THERE IS NO CLEAR MODEL. THE SECOND, ABILITY OR POTENTIAL FOR REPRESENTATION OUTSIDE FHEO, ESPECIALLY THE ABILITY TO HANDLE ASSIGNMENTS REQUIRING ORAL PRESENTATIONS.

IN RESPONSE TO MR BUZZA'S STATEMENT ON MY RANKING IN RELATIONSHIP TO HIS TWO ADDITIONAL FACTORS I MAKE THE FOLLOWING ASSERTION. FIRST AND FOREMOST DISCRIMINATION CASES IN THE BOSTON OFFICE ARE ASSIGNED TO INDIVIDUAL INVESTIGATORS AND NOT ASSIGNED TO TEAMS OF INVESTIGATORS. IN MY THIRTEEN YEARS IN THE FHEO OFFICE I HAVE ONLY BEEN ASSIGNED TO WORK ON CASE AS A TEAM TWO TIMES. THE FIRST TIME WAS FOUR YEARS AGO WHEN THE FHEO HEADQUARTERS OFFICE IN WASHINGTON TELEPHONED OUR THEN BOSTON HUB DIRECTOR ROBERT LAPLANTE AND ASKED IF I COULD HEAD UP A TEAM OF FOUR INVESTIGATORS FROM REGIONS THROGHOUT THE COUNTRY TO INVESTIGATE A SYSTEMIC LENDING DISCRIMINATION CASE AGAINST THE LARGEST MORTGAGE COMPANY IN THE UNITED STATES; COUNTRYWIDE MORTGAGE CORPORATION. IN MY OPINION IT WAS AN HONOR TO HAVE BEEN ASKED TO TAKE ON THIS TASK. FOR OVER TWO YEARS AND COUNTLESS HOURS OF WORK AND TRAVEL TO THEIR HEADQUARTERS OFFICE IN PASADENA, CA THE TEAM ADMINISTRATIVELY CLOSED THE CASE. THE SECOND INSTANCE OF ME WORKING WITH A TEAM APPROACH ON A CASE WAS TWO YEARS AGO WHEN AFTER HAVING A SYSTEMIC INSURANCE REDLING CASE ASSIGNED TO ME AND WORKING ON THE CASE FOR OVER EIGHT MONTHS MR BUZZA INFORMED MY DIRECTOR MR CRAIG HE WANTED STEPHANIE HILL AND BILL HOWELL TWO INDIVIDUALS WITH LESS EXPERIENCE WHO HAD JUST RETURNED TO THE BOSTON OFFICE AFTER BEING AWAY FROM THE BOSTON OFFICE FOR SEVERAL YEARS TO WORK ON MY CASE AS A TEAM. TO BEGIN WITH THESE ARE THE SAME EMPLOYEES WHO WERE GIVEN HIGHER GRADES(13 & 14) AND ALLOWED TO TRANSFER TO THE BOSTON OFFICE AFTER I WAS TOLD BY THE HUB DIRECTOR I COULD NOT GET A "13" BECAUSE THERE WERE TOO MANY 13 AND ABOVE GRADE LEVELS IN OUR OFFICE. THE BOTTOM LINE IS AFTER WORKING ON THE CASE FOR SEVERAL MONTHS AS A TEAM WE HAD A DIFFERENCE OF OPINION ON THE ISSUES IN THE CASE ALONG WITH STRATEGIES TO FOLLOW. BECAUSE OF OUR DIFFERENCES I WENT TO MS BROWN EXPLAINED THE PROBLEM AND ASKED TO BE REMOVED FROM THE CASE. PERMISSION WAS GRANTED, BUT I ASSUME MR BUZZA NEVER GOT OVER MY DECISION AND HAS HELD IT AGAINST ME TO THIS DAY. THE POINT THAT IS MISSED IN THIS EPISODE IS FOR THIRTEEN YEARS I HANDLED OVER TWENTY CASE A YEAR AS THE CASES WERE ASSIGNED TO ME; AS THEY WERE INDIVIDUALLY ASSIGNED TO OTHERS IN MY OFFICE, BUT IN NO WAY HAS THERE EVER BEEN TEAMS OF INVESTIGATORS ASSIGNED TO CASES.

Exhibit 7
Page 2 of 3

REGARDING THE SECOND LOCAL RANKING FACTOR THE ABILITY TO MAKE ORAL PRESENTATIONS AND HANDLING UNEXPECTED ASSIGNMENTS I CAN ONLY CALL YOUR ATTENTION TO MY ANNUAL EVALUATIONS AND SPECIAL ASSIGNMENTS TO THE MORE COMPLEX CASES (LENDING AND LAND USE & ZONING) AND NOVEL FACT PATTERNS AND ISSUES OF LAW I HAVE BEEN ASSIGNED. OVER THE YEARS IN FHEO I HAVE CONCILIATED IN EXCESS OF 90% OF THE CASES ASSIGNED TO ME. I HAVE THE HIGHEST PERCENTAGE OF SETTLEMENTS IN THE BOSTON OFFICE AND WOULD BE WILLING TO SAY I AM CONSIDERED ONE OF THE BEST CONCILIATORS THROUGHOUT ALL THE 12 HUD REGIONS. THE POINT I MAKE IS OVER THE LAST FIVE TO SEVEN YEARS I HAVE RECEIVED OUTSTANDING OR HIGHLY SUCCESSFULL RATINGS ON MY EVALUATIONS BY MY IMMEDIATE SUPERVISOR MR CRAIG, BUT THE INTERESTING FACT IS MR BUZZA HAD TO SIGN OFF ON THE RATING. HOW CAN HE NOW EVALUATE ME SO LOW. ANOTHER INTERESTING NOTE IS OVER THE YEARS I HAVE ON NUMEROUS OCCASION BEEN ASKED TO LECTURE ON THE FAIR HOUSING ACT NOT JUST IN MY REGION, BUT THROUGHOUT THE COUNTRY.

HUB DIRECTOR MARCELLA BROWN REFERS TO HER FIRST HAND KNOWLEDGE OF LINDA TUTTLE'S ABILITY TO HANDLE CASE INVESTIGATIONS. THE FACT IS ROUGHLY THREE YEARS AGO THE OFFICE RECEIVED FOUR SYSTEMIC COMPLAINTS AGAINST THE BOSTON HOUSING AUTHORITY. LINDA DID THE INTAKE WORK ON THE CASES AND THE FOUR CASES WERE ASSIGNED TO ME. BECAUSE OF THE NEED TO ATTEMPT TO RESOLVE THE CASES IN A SPEEDY FASHION LINDA WAS TOLD TO WORK ON ONE OF THE CASES. IN MY OPINION SHE DID A NICE JOB RESOLVING THE CASE WITH A SETTLEMENT. THE DIRECTOR FAILED TO POINT OUT I CONCILIATED THE OTHER THREE CASES WITH A SUBSTANTIAL SETTLEMENT AWARD IN ONE OF THEM. TO THE BEST OF MY KNOWLEDGE THIS CASE AND MAY BE ONE OTHER ARE THE ONLY CASES LINDA EVER WORKED ON AS AN INVESTIGATOR.

4)   WITH RESPECT TO MY KNOWLEDGE AND ABILITY TO USE COMPUTERS. I'M THE FIRST TO ADMIT I AM NOT A COMPUTER WHIZ COMPARED TO MANY OTHER PERSONS IN MY OFFICE. I'M ALSO THE FIRST TO ADMIT ONE PROBLEM IS I NEVER LEARNED TO TYPE EARLIER IN LIFE. I AM CAPABLE OF DOING THE NECESSARY WORK ON THE COMPUER, BUT AT A SLOWER PACE. THE IMPORTANT POINT LOST IN THE ISSUE OF COMPUTER PROFICENCY IS MY JOB AT HUD IS TO INVESTIGATE DISCRIMINATION CASES. THE TOOLS I NEED ARE THE KNOWLEDGE AND ABILITY TO ANALYSE FACTS / ISSUES BASED ON THE FAIR HOUSING ACT. MY RESPONSIBILITIES ARE TO INTERVIEW THE PARTIES TO A COMPLAINT AND ANY WITNESSES ALONG WITH OBTAINING PERTAINANT EVIDENCE. THE USE OF COMPUTERS PLAYS A SMALL PART IN MY EVERY DAY ACTIVITIES. I FEEL I HAVE BEEN MORE THAN COMPETENT IN DOING THE NECESSARY CLOSING REPORTS AND OTHER COPUTERS RESPONSIBILITIES.

IN CONCLUSION I FEEL MR BUZZA AND THE HUB DIRECTOR USED THEIR OWN RANKING FACTORS AND MANUFACTURED STATEMENTS AS A PRETEXT TO DISCRIMINATE AGAINST ME IN THE SELECT PROCESS FOR THE PTO POSITION IN BOSTON.

RUSSELL J. ARCHIBALD          DATE

Exhibit  7
Page  3  of  3

# EXHIBIT 9



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**OFFICE OF THE SECRETARY**
WASHINGTON, D.C. 20410-0001

March 13, 2000

CERTIFIED MAIL
RETURN RECEIPT NUMBER:  Z 460 630 250

Mr. Russell J. Archibald
4 Norwich Drive
Johnston, RI  02919

SUBJECT:    Notice of Acceptance - Russell J. Archibald v. Andrew Cuomo,
            Secretary, U.S. Department of Housing and Urban
            Development, Case Number BN 00 01

Dear Mr. Archibald:

   This refers to our Equal Employment Opportunity (EEO) discrimination
complaint filed on January 11, 2000.  After reviewing your complaint and
the EEO Counselor's Report, I have accepted the following claim for
investigation:

      You were discriminated against because of your race (African
      American) when you were not selected for the position of
      Public Trust Specialist, GS-1101-13, Office of Fair Housing and
      Equal Opportunity,  Massachusetts State Office, advertised under
      position vacancy announcement number 00-PTO-1999-0101AZ.
      You learned on November 22, 1999 that you were not selected
      for the position.

   You also allege that over the past five to six years there has been a
pattern and practice of discrimination against minority employees for
promotions in favor of white employees with less education and work
experience in the Massachusetts State Office of Fair Housing and Equal
Opportunity.  It appears you are attempting to raise a class complaint.

Exhibit 2
Page 1 of 3

-2-

A class is a group of employees, former employees or applicants for employment who, it is alleged, have been or are being adversely affected by an agency personnel management policy or practice that discriminates against the group on the basis of their race, color, religion, sex, national origin, age or handicap.  A class complaint is a written complaint filed on behalf of the class by the agent of the class, alleging that the class is so numerous that a consolidated complaint by the members of the class is impractical, that there are questions of fact common to the class, that the claims of the agent of the class are typical of the claims of the class, and that the agent of the class and, if represented, the representative, will fairly and adequately protect the interests of the class.

EEO Regulations at 29 CFR 1614.204(a)(b) state that a complainant can move for class certification at any reasonable point in the process when it becomes apparent that there are class implications to the claim raised in an individual complaint.  If a complainant moves for class certification after completing the counseling process contained in 1614.105, no additional counseling is required.

You must inform me, in writing,  within 15 days of your receipt of this letter if your intention is to move for class certification.  If I do not hear from you within 15 days of your receipt of this letter, I will process your complaint as an individual complaint.

Your complaint contains a claim for compensatory damages.  To address your claim, you must provide objective proof of the damages suffered as a result of the alleged discrimination, as well as objective proof of a causal connection between the damages and the alleged unlawful discrimination.  Proof can take the form of receipts and/or bills for medical care, medication and transportation to the doctor, your statements concerning your emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health and any other nonpecuniary losses that are incurred as a result of the discriminatory conduct.  You may also provide statements from others, including family

Exhibit _2_
Page _2_ of _3_

-3-

members, friends, health care providers, other counselors, including clergy, who can address the outward manifestations or physical consequences of your emotional distress.

Please submit the documentation to support your claim of compensatory damages to the EEO investigator when he or she meets with you.

Again, you must notify me within 15 calendar days of your receipt of this letter if you wish to move for class certification. You must also notify me, in writing, within fifteen (15) calendar days of your receipt of this letter, if you decide to pursue an individual complaint, if the statement above does not correctly identify your claim. You must specify why the statement is incorrect. Your response will be deemed timely filed it is postmarked, or delivered in person, on or before the fifteen (15) days period expires.

Sincerely,

Barbara Banks, Deputy Director
Equal Employment Opportunity
        Division

cc: Eva Plaza, E

Exhibit _2_
Page _3_ of _3_

# EXHIBIT 10

 

JOB DETAILS    HELP   HOME

Exit to **USAJobs**    Exit to **Customer Survey**    **Print Info**

Use BACK on your browser to return to Job Search Results.

```
USAJOBS                                          CONTROL NO IF5958
-------------------------------------------------------------FM
PUBLIC TRUST SPECIALIST
                                 OPEN PERIOD 07/28/1999 - 08/13/1999
SERIES/GRADE: GS-1101-13/
SALARY: $ 53,793 TO $ 69,930, ANNUAL      PROMOTION POTENTIAL: GS-13
ANNOUNCEMENT NUMBER:  00-PTO-1999-0101AZ

HIRING AGENCY: HUD, ASST SEC FOR FAIR HOUS AND EQUAL OPPOR
DUTY LOCATIONS: 0001  ATLANTA GEORGIA,     GA
                0001  BOSTON MASSACHUSETTS, MA
                0001  DENVER COLORADO, CO

REMARKS: RESTRICTED TO CURRENT HUD EMPLOYEES WITH COMPETITIVE STATUS APPLICANTS
         MUST SUBMIT AN APPLICATION FOR EACH LOCATION OF INTEREST AND INDICATE
         ON APPLICATION BESIDE THE VACANCY NUMBER THE DESIRED LOCATION.



CONTACT:        PTO MERIT STAFFING TEAM
                PHONE: (202) 708-0395

                HUD
                451 7TH STREET, SW
                ROOM 2258
                ATTN:  00-PTO-1999-0101AZ
                WASHINGTON, DC  20410
```

Full vacancy announcement follows. Please be sure to review for complete
qualification and "How to Apply" information.

```
                    Vacancy Announcement
      DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)
        HUD, ASST SEC FOR FAIR HOUS AND EQUAL OPPOR

Vacancy Announcement Number: 00-PTO-1999-0101AZ

Opening Date: 07/28/1999
Closing Date: 08/13/1999

Position:  PUBLIC TRUST SPECIALIST
```

Exhibit 15
Page 1 of 4

GS-1101-13

Salary: $53793 per year - $69930 per year

Promotion Potential: GS-13

Duty Location: 1 vacancy at ATLANTA GEORGIA, GA

                1 vacancy at BOSTON MASSACHUSETTS, MA

                1 vacancy at DENVER COLORADO, CO

Greensboro, NC, Hartford, CT, Kansas City, KS, Milwaukee, WI, Philadelphia, PA, Pittsburgh, PA

Applications will be accepted from:

Restricted to Current HUD employees with Competitive Status

Major Duties:  This opportunity is designed for employees interested in becoming a Fair Housing Equal Opportunity Public Trust Specialist (PTS).  PTS positions are established in each major program areas within the Department and throughout the country.  PTS positions will focus 'front -line' attention to protecting the public's interest in the administration of HUD programs. The incumbent will have responsibility for the most complex program monitoring and management responsibilities.

The Public Trust Specialist is responsible for safeguarding the public trust in communities and organizations receiving HUD administered funds within the field office jurisdiction.  The mission of the Public Trust Specialist is to ensure that federal funds are used appropriately and in compliance with the applicable laws and regulations.  The effectiveness of the HUD 2020 Management Reform effort is dependent upon restoring the publics' trust in HUD's ability to efficiently manage and allocate its resources.  The Public Trust Specialist is integral to this effort and, as such, must develop the skills necessary to lead and assist in this transformation.  Selectees will be provided unique training opportunities and assignments involving national and Department-wide initiatives.

In addition to performing PTS responsibilities,  the individuals selected will be leaders and experts in Fair Housing and Equal Opportunity programs, and will specialize in one or more of the following:  program analysis, intake/assessment, enforcement, compliance, or program operations.  They  are critical to building the HUD organization, expanding the capabilities of our human resource potential, and capable of dealing with the most complex and difficult issues confronting the Agency.

As a member of the HUD's cadre of PTO employees, the incumbent will be expected to attend and complete training courses designed to enhance the essential competencies necessary to perform the functions of a Public Trust Specialist/Officer.

Qualifications Required:

Applicants must meet the selective factor(s) listed below and possess one year of experience equivalent to the next lower grade, in the Federal Service, in the normal line of progression, that is typically related to the work of this position.

Exhibit 5

Page 2 of 4

SELECTIVE PLACEMENT FACTOR

1. Ability to analyze and solve problems related to the technical interpretation and application of Title VIII of the Civil Rights Act of 1968,

Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and
Community Development Act of 1974, Section 3 of the Housing and Urban
Development Act of 1968, Section 504 of the Rehabilitation Act of 1973, Age
Discrimination Act of 1975, Title II of the Americans with Disabilities Act,
and the Fair Housing Act, policies, procedures and standards.
2. Extensive knowledge of the programs and initiatives of the Office of Fair
Housing and Equal Opportunity.


Applicants must meet all time-in-grade and qualification requirements within
30 calendar days after the closing date of this announcement


Knowledges, Skills and Abilities Required:
APPLICANTS ARE REQUIRED TO LIST EACH QUALITY RANKING FACTOR SEPARATELY AND
PROVIDE A NARRATIVE DESCRIPTION OF THEIR EXPERIENCE  TO THE FACTORS BELOW.
APPLICANTS WILL NOT RECEIVE CONSIDERATION IF THIS ADDITIONAL INFORMATION IS
NOT SUBMITTED.

QUALITY RANKING FACTORS:

1.  Skill in fact-finding analysis, formulating and presenting recommendations
and negotiating resolutions of complex issues.
  2.  Ability to gather, assemble and analyze facts, draw conclusions and
devise solutions to assigned problems.
  3.  Ability to communicate clearly, concisely and informatively both orally
and in writing.
  4. Skill in using personal computers and data base systems.

Basis of Rating:

Eligible candidates meeting the minimum qualification requirements and the
selective placement factors, if applicable, candidates will be further
evaluated in accordance with the HUD-AFGE's negotiated merit promotion
procedures by comparing each candidate's total background with the items
listed above.  These items are assigned values and defined by a crediting
plan.  This rating process will determine who will be referred to the
selecting official.

POINTS FOR AWARDS AND PERFORMANCE APPRAISAL:

A maximum of four additional points overall may be credited for awards and
performance appraisals related to one or more of the QRFs listed in the
vacancy announcement.  Failure to provide a narrative description of how a
candidate's awards and performance appraisal relates to the QRFs will result
in no credit for these items.


Pay, Benefits and Work Schedule:
All Federal employees are required by PL 104-134 to have federal payments made
by Direct Deposit.

Conditions of Employment:
Other Information:

· All applicants MUST be a United States Citizen.
· This position is a Bargaining Unit.
· This position is exempt from the Fair Labor Standards Act, as amended.
· HUD IS A SMOKE FREE ENVIRONMENT.
· If selected, male applicants born after December 31, 1959, must confirm
their selective service registration status.  Certification forms are
available at most Federal agency personnel offices or from the Office of
Personnel Management (OPM).

Exhibit 15

· Positions in the Federal service are subject to investigation. You may be asked to complete the necessary investigative form (SF-85, SF-85P, or SF-86) to meet that requirement.
· Applications of candidates eligible for non-competitive reassignment or repromotion will be referred to the selecting official simultaneously with the Selection Roster and their names will be placed on a separate Selection Roster annotated as appropriate "NON-COMPETITIVE REASSIGNMENT, REPROMOTION, TRANSFER, REINSTATEMENT ELIGIBLES." Selecting officials may choose a candidate from either Selection Roster.
· ALL APPLICANTS ARE REQUIRED TO SUBMIT THEIR MOST RECENT PERFORMANCE APPRAISAL.
· Applicants must meet all time-in-grade and qualification requirements within 30 calendar days after the closing date of this announcement.
· Applicants should clearly indicate all experience (including dates and number of hours spent per week), training, education, and awards relevant to the qualification requirements. Training or self development activities must reflect course title, classroom hours completed and date(s). DO NOT SEND POSITION DESCRIPTIONS.


How To Apply:
Applications must be received by the closing date of the announcement to receive consideration.

        Please submit the following documents to the address provided in this announcement:

    (1) A written application for employment. You may use OF-612 (Optional Application for Federal Employment), a resume, or submit an alternative format. You must include all of the information specified in this vacancy announcement and all information listed in the Office of Personnel Management's brochure "Applying for a Federal Job (OF-510). Applications must be Typed or Printed clearly in dark ink.

    (2) Narrative assessment of your qualifications in terms of the Knowledge, Abilities, Skills and Other Characteristics (KASOCS) identified within this announcement. Describe experience (paid or unpaid), education, training and self-development as related to the KASOCS.


Faxed materials will not be accepted.


APPLICANTS MUST SUBMIT AN APPLICATION FOR EACH LOCATION OF INTEREST AND INDICATE BESIDE THE VACANCY NUMBER THE DESIRED LOCATION.

APPLICATIONS MUST BE RECEIVED BY THE CLOSING DATE IN HEADQUARTERS OR IN THE LOCAL OFFICE WHERE THE VACANCY IS LOCATED.

For additional information about this position please contact:
Contact:                PTO MERIT STAFFING TEAM
                        202-708-0395
Please submit your application package to:
                        HUD
                        451 7TH STREET, SW
                        ROOM 2258
                        ATTN: 00-PTO-1999-0101AZ
                        WASHINGTON, DC   20410


The Federal Government is an Equal Opportunity Employer.

Exhibit 15
Page 4 of 4